The following is the PDF of an official transcript. Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL ACTION FILE |
| v. | ) | NO. 1:25-CR-00499-ELR-CCB-1 |
| | ) | |
| SAMUEL TUNICK, | ) | |
| | ) | EVIDENTIARY HEARING |
| Defendant. | ) | |
| | ) | |

---

BEFORE THE HONORABLE
MAGISTRATE JUDGE CHRISTOPHER C. BLY
TRANSCRIPT OF PROCEEDINGS
JULY 20, 2026

---

APPEARANCES:

For the Plaintiff: MATTHEW S. CARRICO
Office of the U.S. Attorney
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Drive SW
Atlanta, Georgia 30303

For the Defendant: JOSEPH AUSTIN
MELISSA MCGRANE
Federal Defender Program, Inc.
101 Marietta Street NW
Suite 1500
Atlanta, Georgia 30303

*Proceedings recorded by mechanical stenography*
*and computer-aided transcript produced by*

WYNETTE C. BLATHERS, RMR, CRR
Official Court Reporter
2114 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 215-1547

**INDEX TO EXAMINATIONS**


| WITNESS | PAGE |
|---|---|
| LARRY FINDLAY | |
| Direct Examination By Mr. Carrico | 13 |
| Cross-Examination By Mr. Austin | 32 |
| JASON THOMAS HAWKINS | |
| Direct Examination By Mr. Carrico | 45 |
| Cross-Examination By Ms. McGrane | 55 |
| LATOYA CASTRO | |
| Direct Examination By Mr. Carrico | 79 |
| Cross-Examination By Mr. Austin | 85 |


**INDEX TO EXHIBITS**

**UNITED STATES' EXHIBITS**


| | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 1 - 3 | Interview Recordings | 24 | 24 |
| 4 | Brochure | 30 | 30 |
| 5 | Email | 55 | 55 |

Monday Morning Session

July 20, 2026

9:37 a.m.

- - -

P R O C E E D I N G S

COURTROOM DEPUTY: All rise. Court is now in session, the Honorable Christopher C. Bly presiding.

THE COURT: Good morning. Please be seated.

All right. The Court calls the case of the United States of America v. Samuel Tunick. It's Criminal Action No. 1:25-CR-499. Matt Carrico is here on behalf of the United States. Good morning to you, sir.

MR. CARRICO: Good morning, your Honor.

THE COURT: And Joe Austin and Melissa McGrane are here on behalf of Mr. Tunick. Good morning to both of you.

MR. AUSTIN: Good morning, Judge.

MS. MCGRANE: Good morning.

THE COURT: Good morning, Mr. Tunick.

THE DEFENDANT: Good morning.

THE COURT: All right. My understanding is that we're here for a suppression hearing. Is that everybody else's understanding as well?

MR. CARRICO: That is what I understand, your Honor. Correct.

THE COURT: All right. Anything before we get

started from either of you?

MS. MCGRANE: Your Honor, just a few preliminary things.

THE COURT: Yeah.

MS. MCGRANE: Well, first I just wanted to point out that Mr. Tunick's family is here from California in his support.

Second, we did have a transcript created of the interrogation. The audio of the video is quite poor, and as a result, the transcript has a lot of sections that say indiscernible and possibly have typos. But I think what we've decided is -- and correct me if I'm wrong, AUSA Carrico -- that we could use the transcript as a tool during the evidentiary hearing and in our post hearing briefing, but, of course, the video will take precedence in what was actually said.

THE COURT: Is this AI generated?

MS. MCGRANE: No. We actually had a court reporter do the transcript, and she tried. But the video is -- the quality is poor, so you really kind of have to try to work with both in figuring out what's going on.

Then the second issue was that we had intended to call --

THE COURT: Let me just talk to Mr. Carrico.

MS. MCGRANE: Okay. Oh, yes. Sorry.

THE COURT: Do you have any objection to that?

MR. CARRICO: So my understanding is, your Honor, at the pretrial conference you said that you want -- you would appreciate the transcript being made but that the audio and the video are the actual evidence.

THE COURT: Yes, and --

MR. CARRICO: Based on what you said, I obviously have no issue with that. We have not --

THE COURT: Well, obviously, if there's anything that you think is inappropriate about that --

MR. CARRICO: Of course.

THE COURT: -- I mean, the way I've done it in the past -- and we've had a few of these recently where -- and I think there it was AI generated, and I don't think that that matters really. But the idea was that the parties were submitting and saying, hey, look, you know, this is just kind of like a guide; right? So, you know, it could be a two-hour interview, and if you know you want to get to the part where they talked about the car, or whatever, it made it a little easier to find. Oh, okay, this is where they're talking about the car. And then you can go to the video itself and have a sense, a little bit easier sense, of where you're looking for that.

Obviously, the video is the evidence, so it may be a situation where, you know, you all give me a transcript that

suggests that somebody said a particular word, and I might think it's a different word or I might not be able to discern the word where the person who did the transcript was able to discern it.

So at the end of the day, the video is going to be what the evidence is, and if there's any disagreement about that, then I'll have to make a factual finding just like I would on any other disagreement of facts. But as long as everybody is okay with that kind of use of the transcript, then I think it's helpful.

MR. CARRICO: Yeah. I am fine with that use of the transcript. The only caveat I would say to that is with regard to refreshing the witness's recollection with the transcript -- obviously, you can refresh a witness's recollection with anything -- but I just think we need to be cautious with putting something like a document in front of a witness and making it seem like there's a record of them saying something when really the record of them saying something is the audio recording. It's not fair to the witness to imply that there is this thing.

THE COURT: I agree on that. I think if we're going to need to refresh anybody's recollection with the video, then we need to do it with the video; right? Particularly because there could be a disagreement about what was said on the video, and then if we try and refresh the witness's

recollection with that, with the transcript over a disputed statement, then we're kind of influencing what the witness's recollection is by suggesting to them what was said.

MR. AUSTIN: So, Judge, I guess with respect to that, you know, I understand from talking to Mr. Carrico that he doesn't -- he may not intend to play any of the video at all. It's obviously going to be entered into evidence. I do, in at least one of our cross-examinations, intend to go through questions, and my intention was to play clips of the video and ask them based on that. I don't think it would be inappropriate, and I will add the caveats of saying, hey, look, we have this written document. It may be accurate. It may help you remember what you said. It may not. But start with the video and see if that's helpful. Does that --

THE COURT: Yeah, I think start with the video, and I'd ask that we talk about it before you give them the transcript. I'm nervous about influencing their memory based on something on the transcript that may or may not be accurate or may or may not be disputed. So I think the way I'd like to do it is if you need to refresh their recollection or you want to talk to them about something that was said during the interaction, to do that with the video itself.

Then if we run into a situation where that's causing problems in some fashion and you want to use the transcript, let's talk about that because that gives me some concern. I'm

not saying no. I just want to talk about it before you do that.

MR. AUSTIN: Understood. And then the other matter with respect to the video is I don't think Mr. Carrico has his government exhibit videos immediately playable, but what we intended to do is just use the versions that we received from the government that are, of course, identical to the ones that are being introduced in evidence, to play those for the Court.

THE COURT: Mr. Carrico.

MR. CARRICO: I can't imagine that the federal defender would ever do anything untoward with the video, so I assume the videos they gave them are the exact same videos and I have no issue with that. I have them burned to a disc that I'm going to enter as an exhibit with the Court. Again, I didn't think it was necessary to play the videos nor did I actually think it was necessary to have a hearing originally, so I'm fine with doing it that way.

THE COURT: Okay. All right. And, Ms. McGrane, I kind of interjected myself before you were going to get to the second issue.

MS. MCGRANE: Yes. The second issue -- and I just wanted to flag it to the Court -- perhaps it would be best discussed after the hearing, but we had intended to call his former lawyer, Daniel Kane, who was representing him at the time of this incident.

THE COURT: Okay.

MS. MCGRANE: And, unfortunately, Mr. Kane's brother has just passed, and he is actually at his brother's funeral today. And Mr. Kane very much wanted to help out and had offered to testify via Zoom, but we thought that would be just totally insensitive to what he needs at this time. So we had talked to the government about possibly allowing some time after this hearing to get a stipulation together, an affidavit from Mr. Kane, that the parties could then stipulate about what Mr. Kane's testimony would have been. And I imagine it would be very brief. It's really just to the issue of his representation of Mr. Tunick. I think it would just be a few sentences, if that.

THE COURT: Yeah. That's fine with me. My intention would be to just leave the evidence open, and if you can work through it in the way of a stipulation, that would be great. If you're not able to work through it in the way of a stipulation and we need to come back for Mr. Kane to very briefly testify, we could do that as well. But it sounds like that probably won't even be necessary, but, yeah, I'm fine with just leaving the evidence open to give you time to work through that. And then once we do, we'll close the evidence, and that's what we'll do.

MS. MCGRANE: Okay. Thank you.

THE COURT: Okay. Any concerns there, Mr. Carrico?

MR. CARRICO: No, not at all, your Honor. I'm confident we'll be able to work something out. I don't think it's going to be an issue.

THE COURT: Okay.

MR. CARRICO: The one thing I would just like to say before we call our first witness, it's my understanding -- or not my understanding -- in reviewing the defendant's motion, they are seeking to preclude the defendant's statements on two grounds. The first is that claims Mr. Tunick's Fifth and Sixth Amendment rights by questioning without immersing Miranda warnings or disregarding Mr. Tunick's request to speak with his attorney were violated, and then the second is the evidence obtained from his cell phone should be suppressed as part of an unreasonable search and seizure.

The government plans to proceed with its witnesses almost exclusively on the first ground, your Honor. With regard to the second ground, the law in the Eleventh Circuit is clear and well-established that a forensic search of a cell phone at the border does not require a warrant, doesn't require probable cause, and it doesn't require any articulable suspicion whatsoever. And it said searches are not limited to government's interest in excluding contraband evidence entering the country. There are multiple Eleventh circuit cases that state that very clearly.

So the government is not planning on eliciting

testimony regarding the search of Mr. Tunick's phone or the reason for searching the phone as none is required. Similarly, the government does not believe that any testimony regarding such is appropriate in this venue, so if defense counsel starts to ask those types of questions, we will object.

THE COURT: Okay. I guess my thought there is that based on what the law is, you are free to tailor the evidence that you want to offer and things that you'll have the burden on and that sort of thing however you see fit. I'm probably going to be pretty lenient in letting them get into things about what was going on that day and things like that.

Obviously, you're doing that based on a legal proposition that the border search was okay and that sort of thing. The defendant may have an argument that, you know, either that that's not the case or that there's reason that that proposition of law should be reconsidered either by the Eleventh Circuit in bond with the Supreme Court and that kind of thing. So I'm going to give them a fair bit of leeway to get into the facts on those issues, but I certainly understand the government's position.

All right. So with that, Mr. Carrico, I'll ask you to call your first witness.

MR. CARRICO: Certainly, your Honor.

THE COURT: And if you could, just give me a roadmap

of where we're going, how many witnesses and --

MR. CARRICO: So I think I'm going to call three witnesses, your Honor, but I may stop short of that. Again, my position was that the video speaks for itself, and we didn't even need a hearing. So if I think we're far enough along, that we don't need to call all three of the witnesses, then that is fine.

The three witnesses are: Larry Findlay, he was the primary questioner of Mr. Tunick during his secondary inspection. The next witness would be Jason Hawkins. He was the customs border patrol supervisor on duty that day. And then the last witness would be LaToya Castro. She was the other CBP officer present during Mr. Tunick's interview.

THE COURT: Thank you. I appreciate that.

MR. CARRICO: You're welcome, your Honor.

COURTROOM DEPUTY: Sir, if you'll please raise your right hand for me.

LARRY FINDLAY,

herein, having been first duly sworn, was examined and testified as follows:

COURTROOM DEPUTY: Thank you. Please state and spell your name for the record, and if you could, speak into the microphone.

THE WITNESS: My name is Larry Findlay, L-a-r-r-y F-i-n-d-l-a-y.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. CARRICO:

Q Mr. Findlay, what do you do for a living?

A I'm a U.S. Customs and Border Protection officer.

Q How long have you been a U.S. Customs and Border Protection officer?

A Approximately seven years.

Q And what did you do before you became a U.S. Customs officer?

A I was a systems analyst with the Department of Defense.

Q Okay. And how long were you with the Department of Defense?

A Approximately three and a half years.

Q And what did you do before that?

A U.S. Army.

Q Okay. How long were you in the Army?

A From '07 to 2011.

Q As a U.S. customs officer, do you receive any special training?

A Yes, sir.

Q Do you receive training on the U.S. customs laws?

A Yes, sir.

Q How about the rules and policies and procedures that govern border searches and things that occur at the U.S.

border?
A Yes, sir.
Q And do you receive training on how to conduct a border interview?
A Yes, sir.
Q Where do you currently serve as a U.S. customs officer?
A Currently Toronto, Canada.
Q And how long have you been stationed in Toronto?
A Approximately nine months.
Q Okay. And --
THE COURT: Mr. Findlay, would you mind just scooting a tiny bit closer to the microphone.
THE WITNESS: Yes, sir.
THE COURT: Thank you. I appreciate it.
BY MR. CARRICO:
Q And where did you serve before that?
A Atlanta, Georgia.
Q And how long did you serve in Atlanta?
A A little over five years.
Q Okay. Did you have any particular or specialized roles when you were with the U.S. Customs and Border Patrol in Atlanta?
A Yes, sir.
Q And what were those?
A I was on the tactical terrorist unit team.

Q Does the tactical terrorist response team also go by TTRT?
A Yes, sir.
Q Okay. Does TTRT conduct secondary border inspections?
A Yes, sir.
Q Does the TTRT only conduct secondary border inspections of individuals who are flagged by the National Targeting Center as potential subjects of terrorist investigations?
A No, sir.
Q Okay. So as a member of the TTRT, you conducted secondary border inspections of all types of people?
A Yes, sir.
Q Could you generally describe for the Court how an inspection of the border works.
A So once a traveler enters, they normally go through primary inspection, and from primary inspection if there's additional inspection, that traveler is escorted to secondary for additional inspection.
Q Okay. Now, you said they start off at primary, and then they get escorted to secondary if that happens; is that right?
A Yes, sir. Yes, sir.
Q So at Hartsfield, how is somebody escorted from primary to secondary?
A It depends. If it's just a general secondary inspection, they're escorted by a civilian escorter, and if it's a lookout, for example, National Target Center lookout, they're

escorted by an officer.
Q Regardless of which type of escort they receive, does the person escorting them ask them questions while they're being escorted?
A No, sir.
Q Okay. Now, I think we've talked about a few things already while I'm standing here that you and I know what they mean, but the Court may or may not know. So just for the record, first of all, where is the border in Atlanta?
A It's at Hartsfield-Jackson.
Q Okay. So any border inspections that occur in Atlanta, do they occur at Hartsfield airport?
A Correct. Yes, sir.
Q And then you've talked about a lookout. What is a lookout?
A So a lookout is a law enforcement term for additional inspection. This person is probably under investigation, for example. This person -- just a flag, flag on individual.
Q So if there's a flag in a person's file when they come to the border, that person, do they automatically get escorted to secondary?
A Yes, sir.
Q Okay. And you said an actual officer escorts them?
A Yes, sir.
Q Okay. How far away from primary inspection is secondary

inspection?
A Around 40 meters.
Q And generally how long does it take to walk from primary to secondary inspection?
A Two to three minutes approximately.
Q All right. Now, we've talked about this already, but what types of things can get someone sent from primary inspection to secondary inspection?
A Could be from the lookout of one, lookout that this person is under investigation. We need to do a thorough inspection of this individual coming into the country, one. This could be for someone, they're trying to declare something, whether it be money or food.
Q Are people ever randomly sent to secondary inspection?
A Yes, sir.
Q Okay. Can someone say or do something at primary inspection that causes them to be sent to secondary inspection?
A Yes, sir.
Q And then you've already covered it, but someone can be sent to secondary inspection at the request of U.S. law enforcement?
A Yes.
Q Can you describe for the Court what secondary inspection looks like.

A So secondary inspection is the area where we have, like, a belt, slash, table, a few computers, and we also have additional rooms a few feet away for a more private interview.
Q At secondary inspection is there a waiting area?
A Yes, sir.
Q And typically when somebody gets to secondary inspection, what happens?
A Typically they -- we have them have a seat, and we do a quick search and assist them to see what this lookout or flag is, and from there we bring the person up and proceed to inspection.
Q Okay. When you bring them up, describe kind of where they're walking up to. What does that look like?
A They'll come up to the podium or the beltline, table or private room.
Q Okay. Who generally conducts the questioning during secondary inspection?
A The secondary officers.
Q And what types of questioning do those officers ask?
A They're trying to get the general where they were, what were you doing, and who they were with and how did they get there and how did it -- you know, there for the trip, stuff like that.
Q Do you guys have a colloquial term that you refer to those questions asked?

A Not really but who, what, when, where, why, how.
Q Okay. What happens if someone refuses to answer questions?
A They refuse, depends, two-prong approach. If they're not a U.S. citizen, that person would additional detain them for a little bit longer, and if they need to be sent back to where they're coming from, we send them back. If they're a U.S. citizen, we'll try to persist on getting the inspection done as far as questioning, as far as searching their bags, as far as searching their person, as far as searching their electronic media.
Q Okay. You mentioned earlier that there's a private room where you can have somebody come back to complete their secondary inspection. What is the purpose of those rooms?
A Privacy, privacy.
Q Okay. Is there any particular thing that gets somebody brought to one of those rooms as opposed to finishing their secondary inspection in the front?
A Could you repeat the question.
Q Is there anything in particular or are there any factors that go into making a person go to a private room as opposed to being just questioned at the -- in the main area of secondary?
A No, sir.
Q Okay. Now, during secondary inspection are searches of

the individual's property conducted?
A Yes, sir.
Q Does that include their luggage?
A Yes, sir.
Q Does it include property on their person?
A Yes, sir.
Q Does it include electronic devices?
A Yes, sir.
Q What generally are you looking for when conducting such searches?
A Anything that's prohibited.
Q Okay. In terms of searching electronic devices, how are those searches conducted if the electronic device is password protected?
A If it's password protected, we -- first of all, we give them, the traveler, the notice, call it tear-off sheet, as it relates to our authority and searching the media, the device, and we request for them to give us the password. If not, we have the authority to hold onto the device and send it to a separate unit for inspection.
Q Okay. Are the devices, when no password is provided, are they detained until you're able to get into the device?
A Yes, sir.
Q After you eventually get into that device, is the device then sent back to the owner after it's been searched?

A Yes, sir.
Q Are there any specific criteria that have to be met before you can search someone's electronic device when they come through customs at Hartsfield?
A No, sir.
Q Are there any instances where someone is sent to secondary inspection -- well, I guess we already covered this. I apologize. Focusing on the private rooms in the back --
A Yes, sir.
Q -- how far away are they from the initial, we'll call it the lobby of secondary?
A Maybe 10 feet.
Q Okay. Could you describe for the Court what those rooms look like.
A Approximately 10 by 15, table, couple chairs, and a camera with a mic.
Q Okay. Are the interviews in the private rooms audio and video recorded?
A Yes, sir.
Q While you were working at Hartsfield Airport, do you recall participating in the secondary inspection of an individual named Samuel Tunick?
A Yes, sir.
Q Did that inspection occur on or about January 24th, 2025?
A Yes, sir.

Q What caused Mr. Tunick to be referred to secondary inspection?
A Mr. Tunick had a lookout from the National Targeting Center.
Q Did you participate in any conversations with any law enforcement agencies regarding the reasons Mr. Tunick was referred to secondary inspection?
A No, sir.
Q With regard to Mr. Tunick, do you recall any conversations regarding Mr. Tunick being referred to secondary inspection that took place before he was referred to you?
A No, sir.
Q In your experience, are referrals of somebody to secondary inspection unusual?
A No, sir.
Q Once Mr. Tunick was referred to secondary inspection, would he have been escorted there as you've previously described?
A Yes, sir.
Q Was he questioned at all between the time you left primary inspection until he arrived in secondary inspection?
A No, sir.
Q Were you present in secondary inspection once Mr. Tunick arrived there?
A Yes, sir.

Q Okay. What was your role with regard to Mr. Tunick's secondary inspection?
A I was the primary lead officer at the time.
Q Where did your initial interview of Mr. Tunick take place?
A I believe when Mr. Tunick came in, based on the fact that it was a target -- National Targeting Center lookout, my supervisor wanted me to take him to secondary in the private room.
Q Okay. Once Mr. Tunick was taken to that private area, what did you do?
A I proceeded to ask him to -- I proceeded to do my investigation.
Q Okay. Were you the only person present in the room with Mr. Tunick?
A No, sir.
Q Who else was present?
A Officer Castro and later on my supervisor.
Q Okay. You said later on. He wasn't there initially?
A No, sir.
Q Okay. Was the entirety of the interview interaction with Mr. Tunick in the secondary inspection interview room video and audio recorded?
A Yes, sir, except for private pat-down.
Q Did the pat-down occur in that room?
A The room next door.

Q Okay. And so everything that went on in that room, though, was recorded?
A Yes, sir.
Q Okay. I'm handing you a disc that's been marked as Government's Exhibit 1 through 3. Do you recognize that disc?
A Yes, sir.
Q What is it?
A This is the recording of the event.
Q Okay. And how do you know that?
A Because I initialed and signed it. I initialed and signed the date on it.
Q Have you had an opportunity to review Government's Exhibits 1 through 3?
A Yes, sir.
Q Are they true and accurate recordings of Mr. Tunick's interview after he was referred to secondary inspection and moved into a private room?
A Yes, sir.
MR. CARRICO: Okay. Your Honor, I move to admit Government's Exhibits 1 through 3.
THE COURT: Any objection?
MR. AUSTIN: No objection.
THE COURT: All right. They're admitted.
(Whereupon, Government's Exhibits 1 through 3 were marked for purposes of identification and admitted into

evidence.)

BY MR. CARRICO:

Q Before you started to ask Mr. Tunick your investigative questions did anyone tell you what questions to ask Mr. Tunick during that secondary inspection?

A No, sir.

Q Did you or any of your colleagues that were present ask Mr. Tunick any questions that are not typically asked during a secondary inspection?

A No, sir.

Q What kind of background information were you given about Mr. Tunick prior to his secondary inspection?

A None.

Q At some point during the interview did you inform Mr. Tunick that you were looking for people involved with pedophiles and stuff like that?

A Yes, sir.

Q Did you accuse Mr. Tunick of being a pedophile?

A No, sir.

Q Did you suspect Mr. Tunick of being a pedophile?

A No, sir.

Q Is that a typical piece of information that you would share with somebody, that that's the kind of thing you're looking for?

A Yes, sir.

Q At some point during the interview did you tell Mr. Tunick that you were going to search his electronic devices and look for things like child pornography?
A Yes, sir.
Q Did you have any reason to suspect Mr. Tunick's devices contained child pornography?
A No, sir.
Q Is it common to inform individuals in secondary inspection that one of the things you'll be searching their electronic devices for is child pornography?
A Yes, sir.
Q Is one of the purposes of customs inspection to make sure that people do not bring contraband into the country?
A Yes, sir.
Q Does that contraband include child pornography?
A Yes, sir.
Q Okay. Is that something you look for on all electronic devices that are searched at the border?
A Yes, sir.
Q At any point in the interview, did Mr. Tunick ask to speak with a lawyer?
A Yes, sir.
Q All right. What was your response?
A I continued to ask my questions.
Q Is that the standard response when someone asks to speak

with a lawyer at the border?
A Yes, sir.
Q During the interview did Mr. Tunick also express his unwillingness to answer questions?
A Yes, sir.
Q What was your response?
A I proceeded to continue asking my questions, sir.
Q Okay. Is that the standard response when someone refuses to answer questions when going through customs?
A Yes, sir.
Q If a U.S. citizen continues to refuse to answer questions upon re-entering the United States, what happens during secondary inspection?
A We'll proceed to search their bags if we haven't done so already, search their person just for pertinent items and search their electronic media if we haven't done so already, and that's it. Let them go.
Q When you say let them go, then they get to enter the country?
A Yes, sir.
Q Okay. At any point in time, did you or any of the officers present threaten Mr. Tunick during the interview?
A No, sir.
Q What was your tone in speaking with Mr. Tunick during the interview?

A Professional.
Q What was the tone of the other officers?
A Professional.
Q Was Mr. Tunick handcuffed at all during the interview?
A No, sir.
Q Was Mr. Tunick under arrest?
A No, sir.
Q Were you and the other officers armed during the interview?
A Yes, sir.
Q Were your firearms visible?
A No, sir.
Q Did anyone draw their firearm during the interview?
A No, sir.
Q Did you ask Mr. Tunick for his password for his phone at some point during the interview?
A Yes, sir.
Q Why did you ask him for his password?
A Because we needed to search the device.
Q And, again, is it standard to ask someone for their password to their electronic devices pursuant to a border search?
A Absolutely.
Q Did he initially decline to give it to you?
A Yes, sir.

Q Did Officer Castro explain to Mr. Tunick what would happen if he failed to provide the password?
A Yes, sir.
Q What did she explain?
A She explained that if he doesn't provide her the password, we'll actually detain the device and send it to a unit to get into the device, and that might take anywhere from two to four weeks, probably more. And he'll get his device back after.
Q Is that a standard explanation of what happens to a person if they refuse to unlock their electronic device at the border?
A Yes, sir.
Q Okay. Was Mr. Tunick also provided with CP -- Customs and Border Patrol's informational brochure regarding electronic device searches?
A Yes, sir.
Q Did Mr. Tunick appear to read and understand the brochure?
A It appeared so.
Q Based on your observing.
A Yes, sir.
Q I'm going to hand you what has been marked as Government's Exhibit 4.
I've already provided defense counsel a copy, and if it's all right, your Honor, I'll hand a copy up to you.
THE COURT: Thank you.

BY MR. CARRICO:
Q What is this document?
A This is a brochure that actually explains our authority and electronic medias.
Q Is that the same brochure that you handed to Mr. Tunick?
A Yes, sir.
Q And is that brochure -- I think you testified about this earlier. But is that the same brochure that is provided to all individuals who electronic devices are being searched?
A Yes, sir.
MR. CARRICO: All right. Your Honor, I'd move to admit Government's Exhibit 4.
THE COURT: Any objection?
MR. AUSTIN: No, your Honor.
THE COURT: All right. Government's Exhibit 4 is admitted.
(Whereupon, Government's Exhibit 4 was marked for purposes of identification and admitted into evidence.)
BY MR. CARRICO:
Q Did Mr. Tunick ultimately provide you with a password?
A Yes, sir.
Q Did you or one of your colleagues input the password into his phone?
A Yes, sir.
Q Who did that?

A Officer Castro.
Q Okay. Were you present when that happened?
A Yes, sir.
Q What did you see happen after the password was put in?
A When she put it in, the phone appeared to be, like, a reset wipe. It was a black screen with a reset wipe prompt on it.

MR. CARRICO: Okay. Hold on one second. No further questions, your Honor.

THE COURT: All right. Mr. Austin.

MR. AUSTIN: Your Honor, if we can -- going to allow us to attach our laptop to the tech?

THE COURT: Yep.

MR. AUSTIN: Judge, do we want to -- that's the question.

THE COURT: We're quickly getting beyond my capabilities here.

James, do you know what that gets hooked up to?

COURTROOM DEPUTY: I do not. There's not a projector here.

THE COURT: Do you need a projector?

MR. AUSTIN: No, we don't.

THE COURT: How does it normally work?

MR. AUSTIN: Let me just -- Judge, can I have permission to approach the witness?

THE COURT: Yes, of course.

MR. AUSTIN: And if I could have just a moment to test the volume on this.

CROSS-EXAMINATION

BY MR. AUSTIN:

Q Good morning, Officer Findlay.

A Good morning, sir.

Q You testified on direct examination that there are different ways that a person can get flagged for a secondary inspection; right?

A Yes, sir.

Q And that one of those ways is if there's a lookout on somebody?

A Yes, sir.

Q And somebody who has a lookout, they get an officer escorting them to the secondary inspection?

A Yes, sir.

Q And that's in contrast to somebody who wants to declare money when they're coming into the country?

A Yes, sir.

Q If that person gets flagged and sent on for a secondary inspection, they just get civilian escort; right?

A Yes, sir.

Q And so because Sam had a lookout on him, he was escorted by an officer rather than a civilian when he went to

secondary?
A He had a lookout from the National Targeting Center, yes, sir.
Q Okay. And because of that, he had an officer escort him to secondary?
A Yes, sir.
Q And then you also testified on direct examination that your supervisor wanted you to take Mr. Tunick to a private room for secondary inspection; right?
A Yes, sir.
Q Is that supervisor Officer Hawkins?
A Yes, sir.
Q And have you talked -- well, when did you have that conversation with Officer Hawkins about him wanting you to take Mr. Tunick to a private room for secondary inspection?
A Prior to Mr. Tunick arrive -- in secondary?
Q Okay. So you had talked to your supervisor about questioning Mr. Tunick prior to him arriving?
A No. Supervisor was, like, Mr. Tunick is coming in? Actually, Mr. Tunick's flag is here. Take him to the private room. That's it.
Q Okay. And did you have any other conversations with your supervisor about Mr. Tunick prior to him arriving at the primary inspection?
A No, sir.

MR. AUSTIN: If I could approach the witness your Honor?

THE COURT: You can approach, and you don't need to ask. That's fine.

MR. AUSTIN: Thank you.

If you don't mind just looking over that and then look up when you're done doing so.

Judge, I've handed the witness what's been marked for identification. It's not in evidence as Government Exhibit 5.

Can I have that back, sir?

THE WITNESS: Sure.

BY MR. AUSTIN:

Q Did you recognize that to be an email?

A Yes, sir.

Q Had you seen that email before you talked to Mr. Tunick?

A No, sir.

THE COURT: Mr. Austin, if you could just make sure that we keep a copy of that. I'd just like there to be in the record a copy of any --

MR. AUSTIN: Sure. And I think, your Honor, that -- I assume Mr. Carrico is going to introduce it, but if that doesn't happen, then I'll do so.

THE COURT: Okay.

BY MR. AUSTIN:

Q You talked about, on direct examination, about how you

referred to child pornography when you were questioning Mr. Tunick?
A Yes, sir.
Q And you told him that you all were looking for people who might be involved with pedophiles?
A Yes, sir.
Q You didn't have any evidence that Mr. Tunick possessed any child pornography?
A Correct.
Q You didn't have any evidence that he was involved with pedophiles?
A Correct.
Q And let me talk to you -- you asked Mr. Tunick about his trip, where he was coming from, the purpose of his trip, and things like that?
A Correct.
Q Let me talk to you about some of what Mr. Tunick told you about his trip. He told you that he was coming from the Dominican Republic?
A Yes.
Q And specifically that he was coming from Puerto Plata. Do you remember that?
A Yes.
Q He told you where he was staying while he was on this trip?

A Not all of it.
Q Okay. But you asked him where he stayed, and he told you that he stayed on a boat while he was there?
A Correct.
Q He told you that this boat belonged to a friend of his?
A Correct.
Q He told you that he was in the DR, the Dominican Republic, for two weeks?
A Correct.
Q He talked about traveling around the island?
A I believe so. I don't really recall, but that sounds right.
Q Okay. He talked to you about going to the east coast where they have nature and whale watching. Do you remember that?
A Yes.
Q And then you started to ask him about his friend?
A Correct.
Q And you introduced that by saying that you wanted to remind him that you were looking for people who were involved in pedophiles? If you want, I can show you the video.
A Could you repeat the question.
Q Yes. So before you started asking him about his friend you said that -- you said, remember when I said we're looking for people who are involved in pedophiles?

A I don't recall that, but I know that's part of the prohibited items or things we're looking for. So I might have said that to him, yes.

Q Okay. I'm going to just play you a clip.

And, your Honor, I will start this at 2:42. I'm going to play it for the witness.

THE COURT: And which exhibit is this?

MR. CARRICO: 1.

MR. AUSTIN: Government Exhibit 1.

THE COURT: Okay.

(Whereupon, a video recording was played.)

THE WITNESS: Okay.

MR. AUSTIN: Your Honor, I've stopped it at 3:22.

THE COURT: Okay.

BY MR. AUSTIN:

Q So do you recall now, Officer Findlay, that you introduced that topic by telling him that you were looking for people who were involved in pedophiles?

A Yes.

Q And Mr. Tunick said that he didn't care to reveal his friend?

A Yes.

Q And then Officer Castro said, does your friend live in the DR?

A Yes, sir.

Q And Mr. Tunick said, not full time?
A Yes, sir.
Q And Officer Castro asked, so a portion of the time they live in America?
A Yes, sir.
Q And Mr. Tunick responded, I don't really want to speak without a lawyer anymore?
A Yes, sir.
MR. AUSTIN: And then I'm going to just start playing at 50 seconds from Government Exhibit 1.
(Whereupon, a video recording was played.)
MR. AUSTIN: So I've stopped it at 1:08.
Officer Findlay, is that -- fair to say that's when the interview started essentially? In secondary anyway?
THE WITNESS: Yes, sir.
MR. AUSTIN: Okay. So -- well, I'll withdraw that.
Now, later in the interview you went on to ask Mr. Tunick some questions about his work history?
THE WITNESS: Yes, sir.
BY MR. AUSTIN:
Q And he told you that he had done political canvassing?
A Yes, sir.
Q For an organization called Working America?
A I believe so, yes, sir.
Q He told you that he worked on a Christmas tree lot?

A Yes, sir.
Q And he talked about the time frame of when he had been doing the political canvassing relative to the election?
A Yes, sir.
Q He told you that he had gone to college?
A Yes, sir.
Q That he'd earned a bachelor's degree?
A Yes, sir.
Q He told you where he went to college?
A Yes, sir.
Q He answered all of those questions?
A Yes, sir.
Q Now, we heard the first time that Mr. Tunick asked to speak to a lawyer in the previous clip that I played for you. I want to talk about the other times that he asked for a lawyer.
A Okay.

MR. AUSTIN: Judge, I'm going to play from 6:46.

THE COURT: Is this still on Government Exhibit 1?

MR. AUSTIN: Yes, your Honor.

THE COURT: Okay.

(Whereupon, a video recording was played.)

MR. AUSTIN: I've stopped it at 7:11.

Officer Findlay, did you hear Mr. Tunick ask to call a lawyer in that clip?

THE WITNESS: Yes, sir.

BY MR. AUSTIN:

Q And so this is about 6 minutes into your interview with him?

A If that's what it is, I believe so.

Q And that was the second time that he asked you to call a lawyer?

A Yes, sir.

MR. AUSTIN: Judge, I'm going to play from Government Exhibit 1 at 11:30.

THE COURT: All right.

MR. AUSTIN: Excuse me. Actually, from 13:05.

(Whereupon, a video recording was played.)

MR. AUSTIN: I've stopped it at 13:25.

Officer Findlay, did you hear Officer Castro explain to Mr. Tunick that if he didn't give you his password, he would seize the phone?

THE WITNESS: Yes.

BY MR. AUSTIN:

Q And the FBI would have to break into it?

A Yes.

Q Or he could give the password, and you could check for the child pornography; right?

A Yes.

Q And she said that you could let him go on about his way if

he gave you the password and you checked for the child pornography?

A Yes, sir.

Q Now I'm going to show you the third time that he asked you for a lawyer.

Judge, this time I'm playing from Government Exhibit 1 at 12:45.

(Whereupon, a video recording was played.)

MR. AUSTIN: I've stopped it at 13:38.

Officer Findlay, you heard Mr. Tunick ask, can I call a lawyer?

THE WITNESS: Yes, sir.

BY MR. AUSTIN:

Q And you and Officer Castro both responded no?

A The video -- if that's what it is, yes, sir.

Q Well, here I'll play it again. I'll just play a short clip of it.

I'm going to play it from 13:20.

THE COURT: All right.

(Whereupon, a video recording was played.)

MR. AUSTIN: I've stopped it at 13:35.

Is that right, Officer Findlay, that you and Officer Castro both tell him, no, he can't call his lawyer?

THE WITNESS: Yes, sir.

BY MR. AUSTIN:

Q And this is the third time now that he's asked for a lawyer?
A Yes, sir.
Q And this is 12 and a half minutes into your interview with him?
A Yes, sir.
Q All right. I want to talk about the fourth time that he asked to call a lawyer.
And, Judge, I'm going to play from 17:01 in Government Exhibit 1.
(Whereupon, a video recording was played.)
MR. AUSTIN: I've stopped it at 17:19.
Officer Findlay, do you hear Mr. Tunick say, I don't understand why I can't call a lawyer?
THE WITNESS: Yes, sir.
BY MR. AUSTIN:
Q And you and Officer Castro started to explain to him why you weren't allowing him to call a lawyer?
A Yes, sir.
Q And ultimately you didn't let him call a lawyer?
A Yes, sir.
Q It was after these four times that he asked to call a lawyer, wasn't able to do so, that you say that he provided a password to his phone?
A I believe so.

MR. AUSTIN: If I could have a moment, your Honor?

THE COURT: Of course.

(Whereupon, there was a pause in the proceedings.)

BY MR. AUSTIN:

Q Officer Findlay, you referred to Mr. Tunick having a lookout on direct examination. Do you remember that?

A Yes, sir.

Q And you said that the lookout came from another either agency or it was an acronym. It might have been NTC?

A National Targeting Center.

Q Okay. National Targeting Center. And your specific team was the Tactical Terrorism Response Team; right?

A Correct.

Q And you knew when you started the secondary inspection of Mr. Tunick, that the reason that you had pulled him was because he had this lookout?

A Yes, sir.

Q From the National Targeting Center?

A Yes, sir.

Q Okay. And you didn't tell him that he had a lookout from the National Targeting Center?

A No, sir.

Q You told him that you were asking these questions of everybody?

A Yes, sir.

(Brief Pause.)

BY MR. AUSTIN:

Q Officer Findlay, there are other units of CBP besides the Tactical Terrorism Response Team that do secondary inspections; right?

A Correct.

Q Sometimes civilian CBP employees do secondary inspections?

A Excuse me?

Q Sometimes civilian employees of CBP do secondary inspections?

A Only CBP officers do secondary inspections.

Q Okay. But not necessarily the TTRT?

A TTRT do secondary inspection general.

Q Right. But I'm asking, there are other officers who are not part of the TTRT who do secondary inspections for CBP?

A Yes, sir.

MR. AUSTIN: Okay. No further questions, your Honor.

THE COURT: All right. Thank you.

Mr. Carrico, does that raise anything you'd like to address on redirect?

MR. CARRICO: No, your Honor.

THE COURT: All right. Officer Findlay, you can step down. Thank you for being here today. We appreciate the efforts that you've made.

Anybody have any objection to Officer Findlay being

excused?

MR. AUSTIN: No, your Honor.

MR. CARRICO: No, your Honor.

THE WITNESS: Thank you.

THE COURT: Thank you for being here today. You're free to go.

THE WITNESS: Thank you, your Honor. Thank you.

(Whereupon, Officer Findlay exited the courtroom.)

COURTROOM DEPUTY: Sir, could you please raise your right hand for me.

JASON THOMAS HAWKINS,

herein, having been first duly sworn, was examined and testified as follows:

COURTROOM DEPUTY: Thank you. Please be seated. Please state and spell your name for the record.

THE WITNESS: Okay. Jason Thomas Hawkins, J-a-s-o-n, Thomas, T-h-o-m-a-s, Hawkins, H-a-w-k-i-n-s.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. CARRICO:

Q Mr. Hawkins, what do you do for a living?

A Right now I'm currently a chief with Customs and Border Protection in Atlanta, point of entry.

Q Okay. And how long have you served in that role?

A As a chief approximately a year and a half.

Q Okay. Were you serving in that role in January of 2025?
A No, sir. I was a supervisor.
Q Okay. And how long were you a supervisor?
A Approximately five years.
Q Okay. And as a supervisor and a chief, where are you stationed?
A Currently as a chief I'm stationed at our cargo facilities in DHL and as a supervisor I was currently stationed at the airport.
Q Okay. And when you say the airport --
A The Atlanta airport, Atlanta airport.
Q All right. And what were your duties as a supervisor at the Atlanta airport?
A I had multiple duties. Sometimes we supervise our admissibility unit -- people come in and out the country -- our primary inspection area where people travel in and out that we talk to, our baggage inspection area. It just depends on where you're detailed or what specialized team you might be supervising.
Q Did your duties include supervising the secondary inspection area from time to time?
A Yes, sir. Multiple times, yeah.
Q Okay. As a supervisor with U.S. Customs, do you receive any special training?
A Yes, sir. We go to multiple different academies,

additional academies, at Charleston and FLETC and -- I'm sorry -- Charleston, South Carolina and also FLETC. That's in Glynco, Georgia.

I did receive additional training to be able to lead officers and be able to provide them with training to become better officers and be able to inspect people and check bags and deter different things from coming into the United States that might hurt or harm U.S. citizens.

Q Okay. Does that training include training on the law regarding U.S. Customs?

A Yes, sir. We get additional training during the year and when we go out to the different academies.

Q Okay. And does that include training on, like, the rules and policies that govern how things are conducted at the border in Atlanta?

A Yes, sir. We get that training, and we also get additional updates if anything comes out that's important to, you know, inspecting different people or applying the law to different prohibited items that come in the country. We get those updates and get those emails and those trainings during the year also.

Q Okay. And does that training include how to conduct a border search including interviews?

A Yes, sir.

Q Okay. Now, are you familiar with how secondary

inspections at the border work?
A Yes, sir. That's one of my special duties. I'm one of the enforcement supervisors during that time period at the Atlanta port of entry so that's where I would detail that majority of time.
Q Okay. What can cause someone to be referred to secondary inspection?
A A multitude of different reasons. One reason, the primary officer might be inspecting the person, asking the individual questions, and it might be their questions they answer, how they answer it. It might be nonverbal cues they give. It might be also something in the computer system that flags them to get sent back to secondary inspection, might be how they answer the question when it's got to do with money or bring any food, prohibited items or -- a multitude of different reasons they can get sent back to secondary inspection.
Q Can people be sent back to secondary inspection randomly?
A Yes. Sometimes. It depends on the flight they're coming from, you know, how long they stayed there. We do have different, I guess you'd say algorithms, different applications that would flag people for different reasons, just based on, like I said, the country or different rules that somebody might put in for them to be randomly selected to get back and do a secondary examination.
Q I think you said sometimes somebody can be sent to

secondary because they've been flagged. Is that what you said?
A Yes, sir.
Q Are those requests sometimes referred to as lookouts?
A Yes, sir. Uh-huh.
Q Okay. How are lookouts made?
A So an individual could be a Customs Border Protection officer. It could be another agent from another federal government agency. They can put in our computer system. I guess we call it techs or you can call it a lookout system where the individual would input information for that person to be sent to secondary to be examined, to ask certain questions and find out additional information about that subject.
Q If a person is referred to secondary inspection, how do they physically get there?
A So an officer escorts the individual to the secondary inspection area, let the secondary officer know that, hey, this subject is here for a secondary inspection, hands that off to the secondary officer. And then he is -- he -- as long as it's not a long line, he additionally -- he does that additional inspection -- I'm sorry -- does that additional inspection based on, you know, the time and place they got there. And he starts that based on the research and based on the lookout that he has.

Q Do escorters question the person while they're walking them from primary to secondary?
A No, sir.
Q And generally how far away is primary from secondary?
A Maybe to a hundred yards maybe at the most, yeah.
Q While you were working Hartsfield Airport do you recall supervising the secondary inspection of an individual named Samuel Tunick?
A Yes, sir.
Q Did that inspection occur on or about January 24th, 2025?
A Yes, sir.
Q I'm going to hand you what has been marked as Government's Exhibit 5.
A Thank you.
Q What is that document?
A It's an email, sir.
Q Okay. If you look at the middle of the email on this chain that was sent at about 4:27 p.m., who sent that email?
A It's by Chief Harding, Charles Harding.
Q And who is Charles Harding?
A Like I said, he's a chief with Customs and Border Protection officer at the port of Atlanta.
Q Okay. If you look at the initial email that was forwarded to you, it references Samuel Tunick; is that correct?
A Yes, sir.

Q Was this the first time you had ever heard of Mr. Tunick?
A Yes, sir.
Q Other than the information in this email, were you provided with any additional information regarding Mr. Tunick prior to his arrival to secondary inspection on that day?
A No, sir.
Q Prior to Mr. Tunick's secondary inspection, did you have any conversations with Nathan Burnham?
A No, sir, other than the email, the email that was sent.
Q Right. I meant --
A Oh, no. No.
Q Sorry. Let me ask that a cleaner way.
A I'm sorry.
Q Did you have any oral conversations with Mr. Burnham?
A No, sir.
Q Did you receive any additional emails or text messages from Mr. Burnham?
A No, sir.
Q Okay. Did you have any conversations regarding Mr. Tunick with any law enforcement agencies other than that email prior to his secondary inspection?
A No, sir.
Q Is that email the reason Mr. Tunick was referred to secondary inspection?
A Yes, sir.

Q In your experience, are such referrals to secondary inspection unusual?
A No.
Q And what was your role, if any, with regard to Mr. Tunick's secondary inspection?
A I was supervising the officers during that inspection.
Q Okay. Did anyone tell you what questions the officers who interviewed Mr. Tunick should ask him during his secondary inspection?
A No. Being a supervisor of Customs and Border Protection we ask the same questions to everybody pretty much.
Q What are those same questions generally?
A Where are you coming from, why were you there, how long were you there, what were you doing, who were you with, you bring anything back prohibited, how much money you travel with, those type of questions.
Q Do you guys have a term you refer to those questions as?
A Yeah, the five W's.
Q Okay. And the five W's are?
A What, when, where, how, why, you know, you were out the country and everything, yeah.
Q Did you tell Officer Castro or Officer Findlay what questions they should ask Mr. Tunick?
A No, just tell them to do their job.
Q Did you or any of your colleagues that were present ask

Mr. Tunick any questions that are not typically asked during a secondary inspection?
A No. No, sir.
Q Is it unusual to inform someone in secondary inspection that one of the things you're looking for is contraband items?
A No, not at all.
Q Okay. Would this include telling someone that you're looking for child pornography?
A Yes. It's definitely one of the things we look for.
Q Is that a typical piece of information that you would share with someone in secondary inspection?
A Yes, sir.
Q At any point in time did you or -- well, let me ask it this way. At any point in time during Mr. Tunick's secondary inspection, did you threaten Mr. Tunick?
A No.
Q Did you witness anyone else threaten Mr. Tunick?
A No, not at all.
Q What was your tone in speaking with Mr. Tunick during the interview?
A So I always tell my officers and myself be calm and cool and collected when we're talking to individuals. You usually get more information when you're respectful and talk to somebody the same way you'd want to be talked and treated, and that's the way I tell my officers to inspect and talk to

different people.
Q Is that how you comported yourself on that day?
A Yes, sir.
Q And to the extent you witnessed your officers interacting with Mr. Tunick, is that how you saw them interacting with him?
A Yes, sir.
Q Okay. To your knowledge, at any point in time was Mr. Tunick placed under arrest?
A No. No, sir.
Q Okay. Were you and the other officers armed during the interview?
A Yes, sir. We are armed.
Q Were your firearms visible?
A Yes, sir.
Q Did anyone draw their firearm during the interview?
A No.

MR. CARRICO: No additional questions, your Honor.

THE COURT: Are you seeking to admit Government's Exhibit 5?

MR. CARRICO: I am. I made a mistake. I apologize. I wanted to admit Government's Exhibit 5. Thank you, your Honor.

THE COURT: Any objection?

MS. MCGRANE: No, your Honor.

THE COURT: All right. Government's Exhibit 5 is admitted.

(Whereupon, Government's Exhibit 5 was marked for purposes of identification and admitted into evidence.)

CROSS-EXAMINATION

BY MS. MCGRANE:

Q Good morning, Officer Hawkins.
A Yes. That's correct.
Q So as you just admitted Government's Exhibit 5, I wanted to go back to that exhibit.
A Uh-huh.
Q This is the email that you received on January 24th, 2025?
A Uh-huh. Yes, ma'am.
Q You have a copy of that in front of you?
A Yes, ma'am.
Q Okay. So this is the same day that Mr. Tunick was scheduled to arrive from the Dominican Republic; correct?
A Yes, ma'am.
Q Okay. And you received that email roughly three hours before his estimated arrival; correct?
A Just look real quick. Yes, ma'am.
Q Okay. You received that email from Charles Harding?
A Yes, ma'am.
Q And what role does Charles Harding have?
A Like I said, he's a chief Customs and Border Protection

officer with the port of Atlanta.

Q Okay. Is that a position that you now occupy?

A Yes. I'm a chief also, uh-huh.

Q So at the time that this email was sent, it was actually initiated by Officer or Agent McGhie; is that right?

A Yeah, Travis McGhie. He's a task force officer. He works with CBP here in Atlanta.

Q Okay. And so you say Officer McGhie works for CBP; is that right?

A Yes, ma'am.

Q So his email address is his.dhs; right?

A Yes.

Q That stands for Homeland Security investigation?

A Yes, ma'am.

Q Which is part of the Department of Homeland Security?

A Yes, ma'am.

Q Okay. And is that different from the email address that you would have, for example?

A Yes. Mine says cbp.dhs.gov.

Q Okay. And why is that? Why is there that difference?

A Because he's a detail task force officer working on behalf of CBP with HSI.

Q Okay. And this email that Travis McGhie initiated was sent to multiple officers and agents; correct?

A Yes, ma'am.

Q Okay. So I see that it was also sent to Nathan Burnham; right?
A Uh-huh.
Q And there are a few officers here from ICE as well?
A Uh-huh.
Q Okay. And this email not only gives you a sense of when Mr. Tunick is set to arrive, but it also provides a picture of him; right?
A Yes, ma'am.
Q And all of his information, such as his date of birth; right?
A So --
Q Oh, actually, I think it got cut off from the section.
A Yeah, just --
Q Never mind.
A Yeah. It shows the time he's coming in, his name, and the picture and everything.
Q Okay. Sorry. The version that I had had, like, a little section off to the side with some of his biographical information.
A Oh, okay. Gotcha.
Q But I think the point is that the email is written such that you can quickly flag Mr. Tunick; correct? As he's coming through inspection?
A Well, it's just a notification. So it's a notification to

let us know somebody is coming in, and, you know, we have to talk to them. So that's really what it is.
Q Okay. And Agent McGhie specifies that Tunick is under investigation by HSI, which is Homeland Security Investigation; right?
A Yes, ma'am.
Q And JTTF; correct?
A Yes, ma'am.
Q Which is the Joint Task Terrorism Force?
A Yes, ma'am.
Q And it says that he's under investigation for suspected terrorist activities; correct?
A Yes, ma'am.
Q Okay. So as part of this email, it instructs officers and law enforcement to conduct a 100 percent baggage exam?
A Uh-huh.
Q What does that mean?
A That means checking all his checked bags, personal bags, any additional items he might have on him, checking, you know, electronic devices, computer, cell phone, you know, pat down, just means everything encompassing when we do our secondary baggage exam.
Q Okay. The email also says to retain all electronics; correct?
A Yes, ma'am.

Q And it also instructs officers to collect passcodes; right?
A Yes, ma'am.
Q It also mentions that Tunick already has a one-day lookout for CTR. What does that mean?
A Counterterrorism.
Q Okay. So CTR stands for counterterrorism?
A Yeah.
Q And then it goes on to say and multiple prim hits. What does that mean?
A Multiple primary hits.
Q So primary hits?
A Yeah.
Q What is that?
A Whenever anybody comes in the country, they have to go through a primary inspection first through a primary officer, and on that computer that the officer is working on, anybody can come up and have different, like I said, flags or hits that might come up.
Q Such as that this person is on a terrorist watch list? Is that what you're referring to?
A That's possible. It's possible.
Q Okay. So he has -- Mr. Tunick has had -- he has multiple primary hits?
A Uh-huh.

Q So when he's traveling through the airport, it sounds like he's getting targeted for a number of different reasons. Is that accurate?
A So anybody can have multiple different, like I say, lookouts or hits on them. Could be from agriculture inspection, could be for a regular bag exam, could be from random baggage exam. So people can have multiple different primary hits on them, and for multiple different factors.
Q Okay. Do you have any sense of what these multiple primary hits were for?
A No, not at the time, no.
Q Okay. Other than the counterterrorism --
A Yeah.
Q -- aspect of this?
A No, ma'am. Other than that, no.
Q Okay. So it does also say that HSI agents will be on site to conduct an interview; correct?
A Yeah. Uh-huh. Yes, ma'am.
Q Okay. And that they will detain devices post the customs and Border Patrol inspection; right?
A Yes, ma'am.
Q So this was sent to a number of officers and forwarded to you; right?
A Uh-huh. Yes, ma'am.
Q So Charles Harding forwards this to you. And why does he

forward it to you?
A Because I'm over the unit. Like I said, that would be expected. So the chief will technically, I guess, give it to the supervisor who will then, you know, work the inspection with the supervisor -- I mean work the inspection with the officers. So he gave it to me as my, I guess you would say, commander. He gave the inspection to me to do.
Q Okay. And then he also specifies that your TTRT team will lead this inspection; right?
A Yes, ma'am.
Q So that's the -- what does the TTRT stand for?
A The Tactical Response Team.
Q Tactical Terrorism Response Team?
A I'm sorry. The Tactical Threat Response Team.
Q Tactical Threat Response Team?
A Yeah.
Q Okay. Do you lead multiple teams?
A Yeah, as I have. Like I said, I'm one of the enforcement supervisor managers, so I have led multiple enforcement teams throughout my career and at the same time.
Q Okay. How many different teams do you have?
A You're talking about during that time period?
Q Yes.
A I had the Tactical Threat Response Team, my Passenger Analysis Unit, our Enforcement Officers, Task Force Officers.

I had our Baggage Secondary Officers, so a multitude of different things I pride myself on being the lead on.
Q Okay. And so when -- okay. So this was designated to you and the TTRT team; right?
A Uh-huh.
Q And that TTRT team on that day was Officer Findlay and Officer Castro; right?
A Yeah. They were members on the team during that time period. We have more members than them, but they were the ones, yeah.
Q Okay. So you get this email roughly three hours before Mr. Tunick is scheduled to arrive; right?
A Uh-huh.
Q And are you -- are any of the other people on this email, any of the other officers, on this email at the airport?
A Yes. We're at the airport.
Q So, like, for example, was Officer Harding with you at that time?
A He was at the airport, but, no, he wasn't with me when I'm doing an inspection, no.
Q Okay. Or is he with you before the inspection?
A During that time, no. He was in another office or area, so he just emailed me the information. I was in, like I said, a different part of the airport. Atlanta airport is pretty big, so I wasn't with him at that time, no.

Q Okay. And Agent Burnham, was he around during this time?
A No.
Q Okay. So when you're waiting for Mr. Tunick, how does that work? Do you just stand at primary inspection and kind of wait for him to arrive?
A We have different computer systems that tells when the flight gets in that gets into the room and also when the primary officer refers the individual to our secondary examination. So me and my officers in the secondary baggage area, and we were just waiting for the subject to get referred back to our area so we can begin our inspection.
Q Okay. So that was you and?
A Officer Findlay and Officer Castro.
Q Okay. And did you put out some sort of notification with respect to other agents about the lookout?
A No.
Q Okay. So he's just flagged, and then the person who deals with him at primary inspection then sends him your way?
A Yes, ma'am.
Q So were you available at -- were you able to witness Mr. Tunick at primary inspection?
A No. I wasn't out there, no, ma'am.
Q As far as you know, was there anything unusual about his interaction at primary inspection?
A No. I didn't -- usually if something is unusual, they'll

put it in the inspection notes or something or they would let us know in the back area. But, no, I received no additional information about anything.
Q Okay. So then Mr. Tunick is brought to the secondary inspection; right?
A Uh-huh.
Q And do you know which officer brought him?
A I'm sorry I don't, no.
Q Okay. And at that point did you meet Mr. Tunick for the first time?
A Yes, ma'am.
Q Okay. And then Mr. Tunick is put into an interview room?
A Yes. We escort him to the interview room, yes, ma'am.
Q And did you have any conversations with Mr. Tunick prior to putting him in the secondary inspection room?
A No, just tell him to follow us, escort him to the back area.
Q Okay. But then once Mr. Tunick is in the secondary inspection room, you leave at some point; right?
A Maybe for -- I don't -- let me see. I don't recall. Maybe I go out for a second here and there, but I'm pretty much there the whole time, if I remember correctly.
Q Okay. So when I say you're there, I mean -- okay. I guess to specify where you were physically, are you maybe behind the mirror of the interview room? Is that --

A Oh, no, I'm in the room --

Q Usually?

A The two officers are leading it, and I'm sitting there kind of, you know, behind them on the side of my two officers, Castro and Findlay. But I am in the room while the inspection is going on.

Q Okay. Do you ever go back and are you able -- are you able to listen to the interview from behind -- from outside of the interview room?

A You're saying if somebody could listen to it from outside?

Q Yes.

A You'd have to be shouting pretty loud for somebody to hear from outside because usually we have the door closed, and we have the cameras. So usually, you know, like I said, we're talking regular tone, so it would be kind of hard for somebody to hear everything, you know. But it's possible, I guess, we'll hear talking real loud.

Q I see. Okay. So you remember being there for at least a good chunk of the interview; right?

A (Nods head.)

Q Did you have a chance to review the video audio recording of the interrogation of Mr. Tunick?

A Yeah, uh-huh. Yes, ma'am.

Q So okay. Well, so during -- so you don't recall leaving the room?

A Maybe, like I said, for a little bit but not, you know -- I'm there the majority of the time.
Q Okay. And so when -- so you're there for at least part of the questioning; right? And you know that Mr. Tunick is under investigation for terrorism, suspected terrorism. What does that mean to you?
A A multitude of different ways somebody could commit terrorism. It could be, like you said, coming to hurt individuals, could be coming to, like I said, bomb. It can be giving bioterrorism. It could be spreading some type of, like I said, blood samples. It could be a multitude of ways people can harm our government and people in the United States, so terrorism is broad, broad answer. So it's a multitude of ways people can come in and try to harm United States citizens.
Q Okay. But you do know that Mr. Tunick is a U.S. citizen; right?
A Yes.
Q So he would be deemed as some sort of domestic terrorist; is that right?
A Yes, ma'am.
Q Or maybe referred to as a domestic terrorist; right?
A Yeah, yeah.
Q And you -- so when you refer to the contraband that you're looking for when people are entering the country, what type of contraband are you typically looking for?

A Like I said, that's broad too. It could be narcotics, like people on no. It could be sexually explicit videos of children on somebody's phone or cell phone or laptop. It could also be, like I said, prohibited type items that might harm our farms or agriculture or different things it could be.

Q Okay. But knowing that Mr. Tunick is considered under investigation for terrorism, what type of contraband are you then looking for on somebody like him?

A We look for everything. So when we do our inspections, we make sure we don't get, like, I guess you'd say pigeonholed. We just ask our regular questions, and based on the interview, we see where they have questioning and where it goes.

Q Okay. But at that time -- well, really at any point you never had any specific evidence or information that Mr. Tunick would be harboring child porn?

A So that's one of the things we, you know, check for and make sure, people are not bringing in those type of items into the country to sell or have. So we make sure we ask those questions during their inspection. So, like I said, it's just a multitude of different things we look at at CBP. And those -- that is one of the major, you know, contraband items we want to make sure we stop people from bringing in the country or selling or receiving.

Q Right. But you don't have any specific information about Mr. Tunick harboring child porn or any sort of --

A Well, majority of our individuals that come into the country we don't have that specific, you know, answers -- I mean have information of that. That's why we have to do a good job during our inspection or baggage exam and looking at different electronics. So just because, like I said, it's just because it's terrorism or contraband is broad, it's just based on our interview techniques and our skills and information we have to gather during that interview and during the inspection that leads to where we're going and if we find additional information based on the inspection or the baggage exam or the electronic devices.

Q Okay. And you knew that Mr. Tunick was suspected of terrorism; right?

A Uh-huh.

Q And you knew that Mr. Tunick was suspected of terrorism with respect to his affiliation with Defend Atlanta Forest?

A No.

Q Okay. So when you were -- when the agents were conducting the interview with Mr. Tunick, right, you were aware, it sounds like, that Mr. Tunick was not answering all of the questions that the officers were asking of him; right?

A Yes. Uh-huh, yes.

Q So specifically at one point in the interview you come in, and you try your hand at convincing Mr. Tunick to answer some of the questions; right?

A Yes, ma'am.

Q And that was because Mr. Tunick hadn't been answering some of the questions?

A Yes, ma'am.

Q And you're aware that he had been asking to speak with a lawyer?

A I believe, yeah, he did ask to speak with one. But what we have to explain -- because, like I said, I've been working CBP for quite a few years. A lot of people, when they get examined or get talked to by us, they try to ask for a lawyer, but what we try to explain to them, what I try to explain to them is you're not under arrest. What we're doing now is administrative. So it's administrative, so it's not criminal. So we're asking the different questions to verify, you know, your citizenship, to verify what you did in the country, to verify you're not bringing prohibited items.

So we have to ask our questions to be legally sufficient and feel like we do our job to protect the country and so at that time period unless we find something criminal and you get criminally charged. But during the regular inspection we're just asking questions, and so a lawyer isn't needed or wouldn't be involved because it's not nothing criminal during that time. It's all administrative.

Q All right. So like Officer Castro had told Mr. Tunick, that he could -- once he answers the questions, he would be

able to leave? Do you remember that?
A Yeah. Once we, you know, ask any individual that comes in the country, once we -- you know, once you answer the questions we ask, we find out the question that we need, and then you'll be able to go and, you know, be on your day, get finished with your travel.
Q Okay. And so along with the lines of the things that you all need to do before Mr. Tunick can go, is you needed to do a bag inspection; right?
A Yes, ma'am.
Q And you were pretty involved in the bag inspection with Officer Findlay; correct?
A Yes, ma'am.
Q So, like I said, you all did a 100 percent bag check of Mr. Tunick's belongings; right?
A Uh-huh. Yes, ma'am.
Q Even went through his personal journal; right?
A Yeah.
Q And I think there was a letter from a friend to his girlfriend --
A Yes, ma'am.
Q -- that you all made a photocopy of; right?
A Yes, ma'am.
Q You guys made photocopies of his journal; right?
A (Nods head.)

Q And, also, I think you inspected or maybe put through the x-ray machine his drum pad; right?
A Yes, ma'am.
Q And his watch?
A Uh-huh.
Q So during that very extensive bag search you didn't find anything illegal; right?
A No, ma'am, not at that time.
Q And nothing contraband was found in his belongings; right?
A No, ma'am.
Q Okay. And then you also conducted the pat-down of Mr. Tunick; right?
A Yes, ma'am.
Q Okay. And do you remember him telling you that he doesn't consent to the pat-down?
A Yes. But, like I said, it's part of our job and for our safety and also part of our job to make sure we do a thorough pat-down. Like I said, I understand people might not feel comfortable at it, but we have to do our job to make sure people are not bringing in, like I stated before, prohibited items and also for our safety also, yeah.
Q Okay. So you took him into the other room?
A Uh-huh.
Q Were you with any other officers?
A Yes. We all would go in with two officers, never an

officer do a pat-down by themselves.
Q Okay. And was the pat-down at all under his clothes?
A No, his clothes. We don't go under the clothes, no, ma'am.
Q Okay. And during that pat-down you didn't find anything illegal on him?
A No, ma'am.
Q So then I'm not sure -- well, so you do know that Mr. Tunick answered a number of questions that the officers asked him; right?
A Uh-huh.
Q So he did tell them where he had been staying in the Dominican Republic; right?
A Yeah.
Q You remember that. Okay. And he also told them how long he had been there --
A Yes, ma'am.
Q -- and the purpose of his travel; right?
A Yes, ma'am.
Q And he had given the officers a lot of information about him and what he does?
A I wouldn't say a lot of information, no. I wouldn't say that, no.
Q Okay. But he told them -- he told them, you know, for example, like, where he went to school; right?

A Certain small details he was very short, wasn't being like a regular person that has nothing to hide, just answering questions. He was being very short and didn't want to fully answer any of our questions or give them the information that we needed to do our inspection and do it, you know, kind of thoroughly and efficiently.

Q So what other questions were there that he didn't -- that you guys wanted him to answer that were necessary for him to answer so that he could leave?

A So, like I said, usually when we're asking, you know, our normal questions, if we ask where are you coming from, what were you doing, how long you were there, who were you with, you know, people usually be -- you know, describe the different activities, what they did throughout the day, you know, we're just trying to gather information so we can, you know, close out our inspection and do our job.

If somebody just bring it real short and not able to answer those questions, then we have to, you know, try to ask additional questions or try to have, I guess you could say, enhance inspection to make sure we get all the answers we need before we feel like the person can be admitted and let go into the United States.

Q Okay. I understand. But even under that paradigm, aside from who he was with, were there other questions that he didn't answer?

A Yeah. Just like I said, if -- just to give you an example, if we just accept, hey, how long he was out the country, what did you do, and somebody just says, hey, I was out for two days, I was just on vacation, then we won't be able to get, you know, any information from anybody. So, like I said, he was very short about his answers, and so we weren't able to get any detail, really detailed information from him, so we have to ask additional questions.

We have to make sure we do our inspection very thoroughly to get the information we need to feel comfortable, like I stated, letting the person come into the country and feel like we did a thorough job.

Q Okay. But at some point it becomes clear that there's a few questions that he's not going to answer; right?

A Uh-huh.

Q And you have Agent -- I'm sorry, not -- yes, Agent Burnham from DHS and Agent Coble with the FBI come into the interview room; right?

A That's afterwards, yeah.

Q Right. So --

A That's after.

Q After that. But you came into the room with them; right?

A Yes.

Q Okay. And were they --

A Well, yeah, yeah. We -- yeah, once we -- yeah. After we

did finish our total inspection, they was able to come in, yeah.
Q So had you signaled to them that you all were done or what?
A Yes. Once we let them know we were done, they came in and talked to him, yeah.
Q Okay. But you remember entering the room with them; right? With FBI Agent Coble and --
A Yeah. I did at one point come in, yeah, uh-huh.
Q Okay. And you remember that -- you remember Agent Burnham asking Mr. Tunick if he has an attorney?
A Yes. I remember the attorney part, yeah.
Q Okay. And you remember that Mr. Tunick pointed to the attorney card on the table; right?
A Yes, uh-huh.
Q Okay. So that attorney card would have been sitting there on the table already before --
A Yes.
Q -- Agent Burnham came; right?
A (Nods head.)
Q Okay. Just one moment, please.
(Whereupon, there was a pause in the proceedings.)
BY MS. MCGRANE:
Q Just a few more questions.
A Okay.

Q So regarding the pat-down, did you -- you didn't -- okay. You asked Mr. Tunick to take off some of his clothes; right?
A Yeah, like a --
THE COURT: Ms. McGrane, where does this fit in? We're getting so far afield, it seems to me, from what we're actually concerned with here. Where does the pat-down fit into this?
MS. MCGRANE: I think it just went generally to his sense of freedom to leave and the level of intrusiveness of this stop.
THE COURT: Okay.
THE WITNESS: If he had a like -- if somebody has a sweater or a jacket on, we have to tell them to take that off so we can do a pat-down. They can't have a jacket or a sweater or something like that on, but we make sure whatever they do have on, at least an outer clothing garment. So it might be a t-shirt or, you know, whatever they might have on, but they can't have a t-shirt and a sweater or a jacket or anything like that on too.
BY MS. MCGRANE:
Q Okay. And just one more question about the electronic devices. So you and the officers were all under orders to retain all the electronic devices; correct?
A Uh-huh. Yes, ma'am.
Q And, also, there was an order to collect passwords; right?

A Yes, ma'am.
Q Also, you're aware that HSI agents were on site to detain those devices after the inspection; right?
A Yes, ma'am.
Q So the intention was to keep those electronic devices to give to the HSI agents; right?
A Yes, ma'am.
Q Because that's where they would ultimately go; right?
A Yes, ma'am.
Q So Customs and Border Patrol wasn't going to give those devices back to Mr. Tunick after the secondary inspection?
A Not necessarily. It all depends on the inspection, how everything goes.
Q Right. But I guess the idea is that the order had already been in place that the device would go to HSI to retain that cell phone; right? Or his devices?
A Yes. But it all depends. Like, they could have checked it out the same day, give it back, or the next 15, 30 minutes. It all depends on what their orders -- I don't particularly know what they're told to do, if they're told to look at something or they're told they have to hold it for a few days, hours. You know, I'm not privy to that.
Q Okay. But that's a call that HSI would make; right?
A Yes, uh-huh.
Q So your team would give the devices over to HSI, and then

they would make that call?
A Yes, ma'am.
MS. MCGRANE: Okay. I think that is all.
MR. CARRICO: Nothing else, your Honor.
THE COURT: All right. Very good.
Thank you, Mr. Hawkins. You can step down.
THE WITNESS: All right. Thank you.
THE COURT: Do you have any objection to Mr. Hawkins being excused?
MR. CARRICO: No, your Honor.
MS. MCGRANE: No. No, your Honor.
THE COURT: All right. Very good. Thank you for being here today. We appreciate it.
THE WITNESS: No problem. Leave this here?
MR. CARRICO: You can leave it. That's fine.
THE COURT: We've been going about an hour and 45 minutes. Do y'all want to take a quick break?
MR. CARRICO: I'm going to be real fast and we can still take -- you shouldn't have said do you want to. You should have just said we are going to take a quick --
THE COURT: Assuming everyone would agree.
MR. CARRICO: We know you're in charge.
THE COURT: Let's take five minutes.
MR. CARRICO: Sure.
COURTROOM DEPUTY: All rise.

(Brief recess.)

COURTROOM DEPUTY: All rise. This Court is again in session.

THE COURT: All right. Back on the record in the case of United States of America v. Samuel Tunick. Please be seated. And then, Mr. Carrico, you can call your next witness.

MR. CARRICO: The government calls LaToya Castro.

COURTROOM DEPUTY: Please stand and raise your right hand for me.

LATOYA CASTRO,

herein, having been first duly sworn, was examined and testified as follows:

COURTROOM DEPUTY: Thank you. Please state and spell your name for the record.

THE WITNESS: Yes. My name is Officer LaToya Castro. That's L-a-t-o-y-a, last name C-a-s-t-r-o.

DIRECT EXAMINATION

BY MR. CARRICO:

Q Officer Castro, what do you do for a living?

A I'm a Customs and Borders officer.

Q And what are your duties as a U.S. customs officer?

A Well, we basically interview passengers that are coming into the United States. We try to mitigate different things like drugs, terrorism, any national threats.

Q And as a customs officer, do you receive special training?
A Yes, sir.
Q Okay. Do you receive training on the U.S. customs laws?
A Yes, sir.
Q Do you receive training on the rules and policies and procedures that are in place for border searches?
A Yes, sir.
Q Do you receive training on how to conduct interviews of people coming back across the border?
A Yes, sir.
Q Okay. And where are you currently stationed as a U.S. customs officer?
A Right now currently at the Atlanta Hartsfield-Jackson International Airport.
Q Okay. And were you stationed there in January of 2025?
A Yes, sir.
Q Okay. While you were working at Hartsfield Airport, do you recall participating in the secondary inspection of an individual by the name of Samuel Tunick?
A Yes, sir.
Q Did that inspection occur on or about January 24th, 2025?
A Yes, sir.
Q What was your role in the secondary inspection of Mr. Tunick?
A I was there to assist the lead in interviewing. Basically

we just interview passengers that are coming in. At the time I was helping to assist the other officer.
Q Okay. Did anyone tell you what questions you should ask Mr. Tunick during his secondary inspection?
A No, sir.
Q Did you or Officer -- who was the other person you were assisting?
A Officer Findlay. Sorry.
Q Did you or Officer Findlay ask Mr. Tunick any questions not typically asked during a secondary inspection?
A No, sir.
Q What are standard types of questions you ask during a secondary inspection?
A We ask travel-related questions, where are you coming from, co-traveler information, who were traveling with, how long did you stay, things of that nature.
Q Okay. Is it unusual to inform someone in secondary inspection one of the things you're looking for is contraband?
A I'm sorry. Can you repeat that.
Q Is it unusual to tell someone that one of the things you're looking for during a secondary inspection is whether they're bringing any contraband into the country?
A No, sir.
Q Would this include telling them that you were looking for things like child pornography or people associated with

pedophilia?
A Yes, sir.
Q Okay. At any time did you or Officer Findlay accuse Mr. Tunick of being a pedophile?
A No, sir.
Q At any point in time did you or Officer Findlay accuse Mr. Tunick of possessing child pornography?
A No, sir.
Q At any point in time did you or Officer Findlay accuse Mr. Tunick of committing any crimes?
A No, sir.
Q At any point in time did you or any of the officers present during Mr. Tunick's interview threaten him in any way?
A No, sir.
Q What was your tone in speaking with Mr. Tunick during the interview?
A I believe my tone was even keel.
Q Okay. And what was the tone of the other officers when you observed them speaking with Mr. Tunick?
A The same.
Q At any point in time was Mr. Tunick placed under arrest?
A No, sir.
Q At any point in time was Mr. Tunick handcuffed?
A No, sir.
Q Were you and the other officers armed during the

interview?
A Yes, sir.
Q Was your firearm visible?
A No, sir.
Q Did anyone draw their firearm during the interview?
A No, sir.
Q At some point in time, did Mr. Tunick express that he didn't want to speak with you?
A Yes, sir.
Q And did you tell Mr. Tunick that he did not have to answer your questions?
A Yes, sir.
Q Did you inform Mr. Tunick that you were going to search his phone?
A Yes, sir.
Q Did you explain to him that he could provide you with the password for his phone so that you could search it right there or in the alternative, if he chose not to give you the password, you would detain the phone until it could be searched and then you would get him his phone back later?
A Yes, sir.
Q Is that a standard explanation you provide to everyone whose phone you're going to search?
A Yes, it is.
Q Why do you provide individuals with that explanation?

A So they're aware of the process.
Q Okay. Did you also provide Mr. Tunick with a brochure explaining the process of searching his electronic devices at the border?
A Yes, sir.
Q Okay. Right in front of you -- yep, there you go -- there's something marked Government's Exhibit 4. Is this the document that you provided Mr. Tunick or is it a copy of the same document you provided Mr. Tunick?
A Yes, sir.
Q Did Mr. Tunick appear to read and understand the document?
A Yes, sir.
Q In general, throughout the secondary inspection process with Mr. Tunick, did he appear to be comfortable asking you questions?
A Yes, sir.
Q Or did he ask you questions?
A Yes, sir.
Q Did you try to provide him with answers to his questions?
A Yes, sir.
Q All right. After you provided him with Government's Exhibit 4, did you ask him for the password for his phone?
A Yes, I did.
Q What did he say?
A He told me he would think about it.

Q Okay. Later on after you asked some additional questions, did you ask him for the password for his phone again?
A Yes, sir.
Q This time did he provide it to you?
A Yes, he did.
Q Why did you ask him for the password to his phone?
A So that we can do a phone examination.
Q Did you put the password he provided into the phone?
A Yes, I did.
Q And what happened when you did that?
A It shut off.

MR. CARRICO: Okay. No additional questions, your Honor.

THE COURT: All right. Thank you.

CROSS-EXAMINATION

BY MR. AUSTIN:
Q Good morning, Officer.
A Good morning.
Q Did you have any conversations -- well, excuse me. Let me back up. January of 2025 did you have a supervisor named Officer Hawkins?
A Yes. Yes, sir.
Q And had he talked to you about Mr. Tunick's secondary inspection prior to you conducting the secondary inspection?
A No, sir.

Q Okay. How did you come to do a secondary inspection of Mr. Tunick?
A Well, I worked in the tactical terrorism unit, and we usually get people who have some type of derogatory, whether it's travels to high-risk countries or some type of derogatory information in the system regarding them. So we get those on the hot list, and then it's our job to vet them and interview them.
Q You used the term "derogatory". A derogatory, can you just explain what you mean by that.
A It could be, like, travel to high-risk countries. It could be several things. It could be a criminal history in the past. It could be sometimes people have situations where they have child pornography in their phone. It could be just -- or it could just be because they've had a whole bunch of no boarding on flights, and maybe we want to investigate why haven't you boarded, what was the reason, what was your trip for. So it's several reasons.
Q So essentially it's some piece of information that causes you to do an additional inspection or take additional measures with regard to that person?
A Correct, in the terrorism unit, yes.
Q Okay. And so how was it that you came to know I'm going to go and speak with Mr. Tunick in secondary inspection? Did it come up on your computer? Did Officer Hawkins talk to you

about it? Was it something else?
A No. We get a list of people that we're going to search for that day.
Q Okay. And so you knew before Mr. Tunick arrived at the airport that you were going to search him or at least your team was going to?
A Well, we were going to interview him, yes, sir.
Q Okay. And Mr. Tunick, during your interview with him, he asked if he could call a lawyer?
A Yes, sir.
Q You didn't allow him to call a lawyer?
A No, sir.
Q And he asked multiple times if he could call a lawyer?
A Yes, sir.
Q And he produced a business card for the person who he said was his lawyer; right?
A Yes, sir.
Q Do you remember that being Daniel Kane?
A I don't recall.
Q Okay. But you remember him giving you a business card or producing a business card and him saying this is my lawyer?
A He could have. I don't remember if he gave me a business card, but I do know he asked to speak to a lawyer.
MR. AUSTIN: Okay. If I could have just one moment?
THE COURT: Of course.

(Brief Pause.)

BY MR. AUSTIN:

Q Officer Castro, you said that you get a list of the people that you're going to interview every day; right?

A Yes, sir.

Q What information is included on that list?

A It's their name, their travel information.

Q Okay. And would you have a photo of that person?

A Well, you can pull up the photo of the person, so it's your job to kind of do your due diligence.

Q Okay. And did you have any other information about Mr. Tunick other than his name?

A I believe I had his travel history. We get, like, little snippets of, you know, maybe the reason why we might want to question them, like I said, travel history or no boards or past criminal history. So I don't recall what we received that day.

Q Okay. Do you recall seeing a reason for why you were going to give Mr. Tunick a secondary inspection of suspected terrorism?

A No, sir. The lead on this was Officer Findlay, so I just assisted. I don't really recall seeing anything.

Q And do you remember if there was anybody else on your list that day of who you were going to search?

A Yes.

Q And were there other people on the list that day?
A Yes.
Q Do you recall how many?
A No.

(Brief Pause.)

MR. AUSTIN: Nothing further, your Honor.

THE COURT: All right.

MR. CARRICO: Nothing additional, your Honor.

THE COURT: All right. Officer Castro, you can step down. Thank you for being here today.

THE WITNESS: Thank you.

THE COURT: Appreciate it.

Any objection to Officer Castro being excused?

MR. CARRICO: No.

MR. AUSTIN: No, your Honor.

THE COURT: You're free to leave. Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Carrico, any further evidence on behalf of the United States?

MR. CARRICO: No, your Honor.

THE COURT: Mr. Austin, as I indicated before, I'll leave the hearing open for the purposes of supplementing it with Kane's testimony either by stipulation, if y'all are able to work through that, or we can have him in if we need to do that as well. But other than Mr. Kane, any evidence on behalf

of Mr. Tunick?

MS. MCGRANE: No, your Honor.

THE COURT: All right. Very well. At least for today's purposes, the evidence is closed.

Do you want to set a briefing schedule now? Do you want to wait and see where we end up with Mr. Kane's information? We're probably going to be, what, about a month out maybe from the transcript?

THE COURT REPORTER: Yes, probably.

THE COURT: A little more than that? I mean, it doesn't matter to me when it is. Should we plan on a little longer than that?

THE COURT REPORTER: No, that's fine.

THE COURT: Do y'all want to just set a briefing schedule with the assumption that we're going to have the transcript in a month or so and operate under the assumption that we'll be able to get Mr. Kane's evidence wrapped up at some point during that time?

MR. CARRICO: That works for the government. I can't imagine it's going to be much of a dispute.

THE COURT: Okay.

MR. AUSTIN: Sure, yes. We can set that now. I did just want to confirm were Government's 1 through 5 all in evidence. 1, 2 and 3 are the videos.

THE COURT: I have 1, 2, 3, 4 and 5, yes.

Let's see. Ms. McGrane and Mr. Austin, I'll kind of start with you. I normally have the defendant file the opening brief. If you want to rely on your original brief, I'm happy to do that. If you would like to start out with a new post hearing brief, I'm happy to do that. I will leave that question to you and give you either option.

MS. MCGRANE: Yes, your Honor. We'll do the post hearing brief. So we'll start, and could we have a month?

THE COURT: Sure.

MS. MCGRANE: Thank you.

THE COURT: So let's see. Today is July 19th, so August 19th I'll have the transcript. So we're looking somewhere around, like, September 19, 20, in that ballpark. Is that what you're thinking for your first brief?

MS. MCGRANE: Yeah, September 18th.

THE COURT: Mr. Tunick is not in custody; right?

MS. MCGRANE: Right.

THE COURT: Okay. Then I'm happy to give you whatever time you need.

MS. MCGRANE: Okay. Just to confirm, your Honor, we have it set for September 18th.

THE COURT: Okay. That's fine.

Mr. Carrico, your response? Give me a reasonable date.

MR. CARRICO: Let's see. I'm just trying to -- I

know the spring break is the week before -- fall break is the week before the 18th, so I might as well do it right before that. So, like, the 11th is probably a Friday or something maybe?

THE COURT: Of what month are we talking about?

MR. CARRICO: October.

THE COURT: You say October 11th?

MR. CARRICO: That sounds about right because of Friday the 9th. So we'll say the 9th.

THE COURT: October 9th?

MR. CARRICO: Yep.

THE COURT: Okay. Any objection to that?

MS. MCGRANE: No, your Honor.

THE COURT: All right. Give me date for a reply.

MS. MCGRANE: Sure. The 23rd.

THE COURT: Of October?

MS. MCGRANE: Yes.

THE COURT: Okay. All right. So we've got the defendant's opening brief on September 18th, the government's reply on October 9th, and the defendant's reply on October 23rd. Is that consistent with what y'all wrote down?

MR. CARRICO: Okay.

MR. AUSTIN: Yes, Judge. 9/18, 10/9, and 10/23.

THE COURT: You got it. All right. I think then that's all we need to do today. Mr. Carrico, is there

anything else on behalf of the United States?

MR. CARRICO: There is not, your Honor. Thank you.

THE COURT: All right. Mr. Austin, Ms. McGrane, anything else on behalf of Mr. Tunick?

MS. MCGRANE: No, your Honor.

THE COURT: All right. Thanks for the help today. We'll be in recess.

(Whereupon, the proceedings were adjourned at 11:40 a.m.)

\- - -

REPORTERS CERTIFICATE

I, Wynette C. Blathers, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on July 20, 2026, in the matter of UNITED STATES OF AMERICA v. SAMUEL TUNICK, Case No. 1:25-CR-00499-ELR-CCB-1; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1 through 93) is a true and accurate record of the proceedings.

This the 12th day of August, 2026.

/s/ Wynette C. Blathers, RMR, CRR
Official Court Reporter

**BY MR. AUSTIN: [14]** 32/5 34/12 34/24 37/15 38/20 40/2 40/19 41/13 41/25 42/16 43/4 44/2 85/16 88/2
**BY MR. CARRICO: [7]** 13/3 14/15 25/2 30/1 30/19 45/20 79/19
**BY MS. MCGRANE: [3]** 55/6 75/23 76/20
**COURTROOM DEPUTY: [12]** 3/6 12/16 12/21 13/1 31/19 45/9 45/14 45/18 78/25 79/2 79/9 79/14
**MR. AUSTIN: [35]** 3/16 7/4 8/3 24/22 30/14 31/11 31/14 31/22 31/24 32/2 34/1 34/5 34/20 37/9 37/13 38/9 38/12 38/16 39/18 39/20 39/23 40/9 40/12 40/14 41/9 41/21 42/12 43/1 44/17 45/2 87/24 89/6 89/15 90/22 92/23
**MR. CARRICO: [38]** 3/13 3/23 5/2 5/7 5/11 6/11 8/10 10/1 10/5 11/24 12/2 12/15 24/19 30/11 31/8 37/8 44/21 45/3 54/18 54/21 78/4 78/10 78/15 78/18 78/22 78/24 79/8 85/12 89/8 89/14 89/20 90/19 91/25 92/6 92/8 92/11 92/22 93/2
**MS. MCGRANE: [22]** 3/17 4/2 4/5 4/18 4/25 8/21 9/2 9/24 54/25 76/8 78/3 78/11 90/2 91/7 91/10 91/15 91/17 91/20 92/13 92/15 92/17 93/5
**THE COURT REPORTER: [2]** 90/9 90/13
**THE COURT: [90]** 3/8 3/14 3/18 3/20 3/25 4/4 4/17 4/24 5/1 5/6 5/9 5/12 6/21 7/15 8/9 8/18 9/1 9/14 9/25 10/4 11/7 11/25 12/14 14/11 14/14 24/21 24/23 29/25 30/13 30/15 31/10 31/13 31/16 31/21 31/23 32/1 34/3 34/17 34/23 37/7 37/10 37/14 39/19 39/21 40/11 41/19 43/2 44/18 44/22 45/5 54/19 54/24 55/1 76/4 76/11 78/5 78/8 78/12 78/16 78/21 78/23 79/4 85/14 87/25 89/7 89/9 89/12 89/16 89/18 89/21 90/3 90/10 90/14 90/21 90/25 91/9 91/11 91/16 91/18 91/22 92/5 92/7 92/10 92/12 92/14 92/16 92/18 92/24 93/3 93/6
**THE DEFENDANT: [1]** 3/19
**THE WITNESS: [20]** 12/24 14/13 34/11 37/12 38/15 38/19 40/1 40/18 41/12 41/24 42/15 45/4 45/7 45/16 76/12 78/7 78/14 79/16 89/11 89/17

**'**

**'07 [1]** 13/18

**/**

**/s [1]** 94/18

**1**

**10 [2]** 21/12 21/15
**10/23 [1]** 92/23
**10/9 [1]** 92/23
**100 [2]** 58/15 70/14
**101 [1]** 1/18
**11:30 [1]** 40/10
**11:40 [1]** 93/8
**11th [2]** 92/3 92/7
**12 [1]** 42/4
**12:45 [1]** 41/7
**12th [1]** 94/14
**13:05 [1]** 40/12
**13:20 [1]** 41/18
**13:25 [1]** 40/14
**13:35 [1]** 41/21
**13:38 [1]** 41/9
**15 [2]** 21/15 77/18
**1500 [1]** 1/18
**1547 [1]** 1/24
**17:01 [1]** 42/9
**17:19 [1]** 42/12
**18 [1]** 92/23
**18th [4]** 91/15 91/21 92/2 92/19
**19 [1]** 91/13
**19th [2]** 91/11 91/12
**1:08 [1]** 38/12
**1:25-CR-00499-ELR-CCB-1 [2]** 1/4 94/10

**2**

**20 [4]** 1/10 3/2 91/13 94/8
**2011 [1]** 13/18
**2025 [7]** 21/24 46/1 50/10 55/12 80/15 80/21 85/20
**2026 [4]** 1/10 3/2 94/8 94/14
**2114 [1]** 1/23
**215-1547 [1]** 1/24
**23 [1]** 92/23
**23rd [2]** 92/15 92/21
**24th [4]** 21/24 50/10 55/12 80/21
**2:42 [1]** 37/5

**3**

**30 [1]** 77/18
**30303 [3]** 1/15 1/19 1/24
**3:22 [1]** 37/13

**4**

**40 [1]** 17/2
**404 [1]** 1/24
**45 [1]** 78/16
**499 [1]** 3/11
**4:27 [1]** 50/18

**5**

**50 [1]** 38/10
**55 [1]** 2/9

**6**

**600 [1]** 1/14
**6:46 [1]** 39/18

**7**

**75 [2]** 1/15 1/23
**7:11 [1]** 39/23

**9**

**9/18 [1]** 92/23
**90 [1]** 1/3
**93 [1]** 94/12
**9:37 [1]** 3/3
**9th [4]** 92/9 92/9 92/10 92/20

**A**

**a.m [2]** 3/3 93/9
**Absolutely [1]** 28/23
**academies [3]** 46/25 47/1 47/12
**accept [1]** 74/2
**accuse [4]** 25/18 82/3 82/6 82/9
**acronym [1]** 43/9
**across [1]** 80/9
**ACTION [2]** 1/4 3/10
**activities [2]** 58/12 73/14
**add [1]** 7/11
**address [3]** 44/20 56/11 56/17
**adjourned [1]** 93/8
**administrative [3]** 69/13 69/13 69/23
**admissibility [1]** 46/15
**admit [4]** 24/19 30/12 54/19 54/22
**admitted [9]** 2/16 24/23 24/25 30/16 30/18 55/2 55/4 55/9 73/21
**affidavit [1]** 9/8
**affiliation [1]** 68/16
**afield [1]** 76/5
**afterwards [1]** 74/19
**agencies [2]** 22/6 51/20
**agency [2]** 43/9 49/9
**agent [10]** 49/8 56/5 58/3 63/1 74/16 74/16 74/17 75/8 75/10 75/19
**agents [6]** 56/24 60/16 63/15 68/18 77/2 77/6
**agriculture [2]** 60/5 67/5
**AI [2]** 4/17 5/14
**aided [1]** 1/21
**airport [17]** 16/12 21/20 46/9 46/10 46/11 46/11 46/13 50/6 60/1 62/15 62/16 62/19 62/24 62/24 80/14 80/17 87/5
**algorithms [1]** 48/20
**allow [2]** 31/11 87/11
**allowing [2]** 9/7 42/18
**almost [1]** 10/16
**alternative [1]** 83/18
**Amendment [1]** 10/10
**AMERICA [6]** 1/3 3/10 38/4 38/23 79/5 94/9
**Analysis [1]** 61/25
**analyst [1]** 13/11
**answer [17]** 19/2 27/4 27/9 27/11 48/10 48/11 48/14 66/13 68/24 70/3 73/4 73/8 73/9 73/18 73/25 74/14 83/10
**answers [5]** 68/2 69/25 73/20 74/6 84/19
**anybody's [1]** 6/22
**anymore [1]** 38/7
**apologize [2]** 21/8 54/21
**APPEARANCES [1]** 1/12
**applications [1]** 48/21
**applying [1]** 47/18
**appreciate [6]** 5/4 12/14 14/14 44/23 78/13 89/12
**approach [4]** 19/4 31/25 34/1 34/3
**area [13]** 18/1 18/4 19/22 23/9 46/16 46/17 46/21 49/18 62/22 63/10 63/11 64/2 64/17
**argument [1]** 11/15
**armed [4]** 28/8 54/11 54/13 82/25
**Army [2]** 13/16 13/17

## A

**arrest [4]** 28/6 54/9 69/12 82/21
**arrival [2]** 51/5 55/20
**arrive [5]** 33/16 55/17 57/7 62/12 63/5
**arrived [3]** 22/21 22/24 87/4
**arriving [2]** 33/18 33/23
**articulable [1]** 10/20
**aspect [1]** 60/14
**assist [3]** 18/9 80/25 81/2
**assisted [1]** 88/22
**assisting [1]** 81/7
**associated [1]** 81/25
**assume [2]** 8/12 34/21
**Assuming [1]** 78/21
**assumption [2]** 90/15 90/16
**ATLANTA [22]** 1/2 1/15 1/19 1/24 14/17 14/18 14/22 16/9 16/11 45/23 46/11 46/11 46/13 47/15 48/4 50/22 56/1 56/7 62/24 68/16 80/13 94/6
**attach [1]** 31/12
**attached [1]** 1/4
**attaching [1]** 1/7
**attorney [6]** 1/13 10/12 75/11 75/12 75/14 75/16
**audio [6]** 4/9 5/4 6/19 21/17 23/22 65/21
**August [2]** 91/12 94/14
**August 19th [1]** 91/12
**AUSA [1]** 4/12
**AUSTIN [7]** 1/16 3/14 31/10 34/17 89/21 91/1 93/3
**authority [3]** 20/17 20/19 30/3
**automatically [1]** 16/20

## B

**bachelor's [1]** 39/7
**background [1]** 25/11
**bag [5]** 60/6 70/9 70/11 70/14 71/6
**baggage [8]** 46/17 58/15 58/22 60/7 62/1 63/9 68/4 68/10
**bags [5]** 19/9 27/14 47/6 58/18 58/18
**ballpark [1]** 91/13
**becomes [1]** 74/13
**behind [3]** 64/25 65/4 65/8
**belonged [1]** 36/5
**belongings [2]** 70/15 71/9
**belt [1]** 18/2
**beltline [1]** 18/14
**besides [1]** 44/3
**beyond [1]** 31/16
**biographical [1]** 57/19
**bioterrorism [1]** 66/10
**birth [1]** 57/10
**black [1]** 31/6
**BLATHERS [3]** 1/22 94/4 94/18
**blood [1]** 66/11
**BLY [2]** 1/9 3/7
**boarded [1]** 86/17
**boarding [1]** 86/16
**boards [1]** 88/15
**boat [2]** 36/3 36/5
**bomb [1]** 66/9
**bond [1]** 11/18
**border [34]** 10/19 11/14 12/11 13/5 13/6 13/25 14/1 14/3 14/21 15/3 15/5 15/10 15/13 16/9 16/11 16/20 26/18 27/1 28/21 29/11 29/14 45/22 47/15 47/23 48/1 49/7 50/21 52/10 55/25 60/20 77/10 80/6 80/9 84/4
**Borders [1]** 79/21
**brief [11]** 9/11 44/1 79/1 88/1 89/5 91/3 91/3 91/5 91/8 91/14 92/19
**briefing [3]** 4/14 90/5 90/14
**broad [4]** 66/13 66/13 67/1 68/6
**brochure [8]** 2/18 29/14 29/17 30/3 30/5 30/7 30/8 84/2
**brother [1]** 9/2
**brother's [1]** 9/3
**bunch [1]** 86/15
**burden [1]** 11/9
**burned [1]** 8/13
**Burnham [8]** 51/8 51/14 51/17 57/1 63/1 74/16 75/10 75/19
**business [4]** 87/15 87/20 87/21 87/22

## C

**C-a-s-t-r-o [1]** 79/17
**California [1]** 4/6
**calm [1]** 53/21
**camera [1]** 21/15
**cameras [1]** 65/14
**Canada [1]** 14/7
**canvassing [2]** 38/21 39/3
**capabilities [1]** 31/17
**car [2]** 5/19 5/21
**card [6]** 75/14 75/16 87/15 87/20 87/21 87/23
**career [1]** 61/20
**cargo [1]** 46/7
**Carolina [1]** 47/2
**CARRICO [15]** 1/13 3/11 4/12 4/24 7/5 8/4 8/9 9/25 11/22 34/21 44/19 79/6 89/18 91/23 92/25
**Castro [22]** 12/12 23/17 29/1 31/1 37/23 38/3 40/15 41/14 41/23 42/17 52/22 62/7 63/13 65/5 69/24 79/8 79/11 79/16 79/20 88/3 89/9 89/13
**cautious [1]** 6/16
**caveat [1]** 6/12
**caveats [1]** 7/11
**CBP [11]** 12/13 44/3 44/7 44/9 44/11 44/15 56/7 56/8 56/22 67/20 69/9
**cbp.dhs.gov [1]** 56/19
**CCB [2]** 1/4 94/10
**cell [5]** 10/13 10/18 58/20 67/3 77/16
**Center [9]** 15/6 15/25 22/4 23/6 33/2 43/10 43/11 43/18 43/21
**CERTIFICATE [1]** 94/1
**certify [1]** 94/6
**chain [1]** 50/18
**chairs [1]** 21/15
**chance [1]** 65/21
**charge [1]** 78/22
**charged [1]** 69/20
**Charles [5]** 50/19 50/20 55/22 55/24 60/25
**Charleston [2]** 47/1 47/2
**chief [9]** 45/22 45/25 46/5 46/7 50/19 50/21 55/25 56/3 61/3
**child [14]** 26/3 26/6 26/10 26/15 35/1 35/8 40/23 41/1 53/8 67/15 67/25 81/25 82/7 86/14
**children [1]** 67/3
**chose [1]** 83/18
**Christmas [1]** 38/25
**CHRISTOPHER [2]** 1/9 3/7
**chunk [1]** 65/19
**circuit [3]** 10/17 10/23 11/18
**cite [1]** 1/4
**citizen [4]** 19/5 19/8 27/11 66/15
**citizens [2]** 47/8 66/14
**citizenship [1]** 69/15
**civilian [5]** 15/24 32/22 32/25 44/7 44/9
**claims [1]** 10/9
**cleaner [1]** 51/12
**clear [2]** 10/18 74/13
**clip [4]** 37/4 39/14 39/25 41/17
**clips [1]** 7/9
**close [2]** 9/22 73/16
**closed [2]** 65/13 90/4
**closer [1]** 14/12
**clothes [4]** 72/2 72/3 72/3 76/2
**clothing [1]** 76/16
**CM [2]** 1/2 1/3
**CM/ECF [2]** 1/2 1/3
**co [1]** 81/15
**co-traveler [1]** 81/15
**coast [1]** 36/13
**Coble [2]** 74/17 75/8
**colleagues [3]** 25/7 30/22 52/25
**collect [2]** 59/1 76/25
**collected [1]** 53/22
**college [2]** 39/5 39/9
**colloquial [1]** 18/24
**comfortable [3]** 71/19 74/10 84/14
**commander [1]** 61/7
**commit [1]** 66/7
**committing [1]** 82/10
**common [1]** 26/8
**complete [1]** 19/13
**comported [1]** 54/2
**computer [7]** 1/21 48/12 49/9 58/20 59/17 63/6 86/25
**computer-aided [1]** 1/21
**computers [1]** 18/2
**concern [1]** 7/25
**concerns [1]** 9/25
**conduct [7]** 14/3 15/3 15/5 47/22 58/15 60/17 80/8
**conducted [5]** 15/9 20/1 20/13 47/14 71/11
**conducting [3]** 20/9 68/18 85/24
**conducts [1]** 18/16
**conference [1]** 5/3
**confident [1]** 10/2
**confirm [2]** 90/23 91/20
**connection [1]** 94/10
**consent [1]** 71/15
**consistent [1]** 92/21
**contained [1]** 26/6
**continued [1]** 26/24
**contraband [12]** 10/22 26/13 26/15 53/5 66/23 66/25 67/7 67/21 68/6 71/9 81/18 81/22
**contrast [1]** 32/18
**convincing [1]** 68/24
**cool [1]** 53/21

C

counterterrorism [3] 59/6 59/7 60/12
countries [2] 86/5 86/11
country [20] 10/23 17/11 26/13 27/19 32/19 46/15 47/19 48/22 52/21 59/15 66/24 67/18 67/23 68/2 69/15 69/18 70/3 74/3 74/11 81/22
court [21] 1/2 1/6 1/8 1/1 1/22 3/6 3/9 4/18 8/8 8/14 8/22 11/18 15/12 16/8 17/24 21/13 79/2 94/4 94/5 94/8 94/19
Courthouse [2] 1/14 1/23
courtroom [1] 45/8
covered [2] 17/20 21/7
CP [1] 29/13
CR [3] 1/4 3/11 94/10
created [1] 4/8
crimes [1] 82/10
criminal [7] 1/4 3/10 69/13 69/19 69/23 86/12 88/16
criminally [1] 69/20
criteria [1] 21/2
cross [5] 2/9 7/8 32/4 55/5 85/15
Cross-Examination [4] 2/9 32/4 55/5 85/15
cross-examinations [1] 7/8
CRR [2] 1/22 94/18
CTR [2] 59/5 59/7
cues [1] 48/11
custody [1] 91/16
customs [26] 12/11 13/5 13/6 13/9 13/19 13/22 14/6 14/21 21/4 26/12 27/9 29/13 45/22 46/23 47/10 49/7 50/21 52/10 55/25 60/19 77/10 79/21 79/22 80/1 80/3 80/12
cut [1] 57/13

D

Daniel [2] 8/24 87/18
decided [1] 4/12
declare [2] 17/12 32/18
decline [1] 28/24
deemed [1] 66/18
Defend [1] 68/16
defendant [4] 1/6 1/16 11/15 91/2
defendant's [4] 10/7 10/8 92/19 92/20
defender [2] 1/17 8/11
defense [4] 11/4 13/11 13/13 29/23
Department [3] 13/11 13/12 56/15
depends [7] 15/23 19/4 46/17 48/18 77/12 77/17 77/19
derogatory [4] 86/4 86/5 86/9 86/9
designated [1] 62/3
detail [3] 48/4 56/21 74/7
detailed [2] 46/18 74/7
details [1] 73/1
detain [5] 19/5 29/6 60/19 77/2 83/19
detained [1] 20/22
deter [1] 47/7
device [14] 20/13 20/17 20/19 20/22 20/24 20/24 21/3 28/19 29/6 29/7 29/8 29/10 29/15 77/15
devices [20] 20/7 20/12 20/21 26/2 26/5 26/10 26/18 28/21 30/9 58/20 60/19 68/11 76/22 76/23 77/3 77/5
77/11 77/16 77/25 84/3
DHL [1] 46/8
DHS [1] 74/17
difference [1] 56/20
diligence [1] 88/10
direct [7] 13/2 32/8 33/7 34/25 43/6 45/19 79/18
disagreement [3] 6/6 6/8 6/24
disc [3] 8/13 24/4 24/5
discern [2] 6/2 6/4
dispute [1] 90/20
disputed [2] 7/1 7/19
disregarding [1] 10/11
DISTRICT [5] 1/1 1/1 1/14 94/5 94/5
DIVISION [1] 1/2
docket [1] 1/5
document [8] 1/8 6/16 7/12 30/2 50/15 84/8 84/9 84/11
domestic [2] 66/18 66/21
Dominican [4] 35/19 36/7 55/17 72/13
DR [2] 36/7 37/24
draw [3] 28/13 54/16 83/5
drum [1] 71/2
duly [3] 12/19 45/12 79/12
duties [5] 46/12 46/14 46/20 48/2 79/22
duty [1] 12/11

E

earned [1] 39/7
easier [2] 5/20 5/22
east [1] 36/13
ECF [2] 1/2 1/3
efficiently [1] 73/6
efforts [1] 44/24
election [1] 39/3
electronic [20] 19/11 20/7 20/12 20/13 21/3 26/2 26/9 26/17 27/16 28/21 29/10 29/14 30/4 30/9 58/20 68/11 76/21 76/23 77/5 84/3
electronics [2] 58/23 68/5
Eleventh [3] 10/17 10/23 11/18
eliciting [1] 10/25
ELR [2] 1/4 94/10
else's [1] 3/22
email [26] 2/19 34/13 34/15 50/16 50/17 50/18 50/23 51/3 51/9 51/9 51/20 51/23 55/12 55/19 55/22 56/4 56/11 56/17 56/23 57/6 57/22 58/14 58/23 62/11 62/14 62/15
emailed [1] 62/23
emails [2] 47/20 51/16
employees [2] 44/7 44/9
encompassing [1] 58/21
enforcement [9] 16/16 17/22 22/6 48/3 51/20 58/15 61/18 61/19 61/25
enhance [1] 73/20
enter [2] 8/14 27/18
enters [1] 15/14
entirety [1] 23/20
entry [3] 1/5 45/23 48/4
escort [5] 16/2 32/22 33/4 64/13 64/16
escorted [9] 15/16 15/19 15/21 15/24 16/1 16/4 16/20 22/17 32/24
escorter [1] 15/24
escorters [1] 50/1
escorting [2] 16/3 32/16
escorts [2] 16/23 49/17
essentially [2] 38/14 86/19
established [1] 10/18
estimated [1] 55/20
event [1] 24/8
everybody [4] 3/21 6/9 43/24 52/11
everyone [2] 78/21 83/22
evidence [23] 5/5 5/24 6/6 7/7 8/8 9/15 9/21 9/22 10/13 10/22 11/8 25/1 30/18 34/9 35/7 35/10 55/4 67/14 89/18 89/25 90/4 90/17 90/24
evidentiary [2] 1/6 4/14
exam [6] 58/15 58/22 60/6 60/7 68/4 68/11
examination [14] 2/9 13/2 32/4 32/8 33/7 34/25 43/6 45/19 48/24 55/5 63/9 79/18 85/7 85/15
examinations [2] 2/1 7/8
examined [5] 12/19 45/12 49/12 69/10 79/12
excluding [1] 10/22
exclusively [1] 10/16
excuse [3] 40/12 44/8 85/19
excused [3] 45/1 78/9 89/13
exited [1] 45/8
experience [2] 22/13 52/1
explanation [3] 29/9 83/22 83/25
explicit [1] 67/2
express [2] 27/3 83/7
extensive [1] 71/6
extent [1] 54/4

F

facilities [1] 46/7
fact [1] 23/5
factors [2] 19/20 60/8
facts [2] 6/8 11/20
factual [1] 6/7
failed [1] 29/2
fall [1] 92/1
family [1] 4/6
farms [1] 67/5
fashion [1] 7/24
fast [1] 78/18
FBI [3] 40/20 74/17 75/8
federal [3] 1/17 8/10 49/8
Fifth [1] 10/9
file [3] 1/4 16/19 91/2
Findlay [29] 12/8 12/18 12/24 13/4 14/11 32/6 37/16 38/13 39/24 40/15 41/10 41/22 42/13 43/5 44/3 44/22 44/25 45/8 52/22 62/6 63/13 65/5 70/12 81/8 81/9 82/3 82/6 82/9 88/21
finish [1] 75/1
finished [1] 70/6
finishing [1] 19/17
firearm [4] 28/13 54/16 83/3 83/5
firearms [2] 28/11 54/14
fit [3] 11/10 76/4 76/6
flag [8] 8/22 16/18 16/18 16/19 18/9 33/20 48/21 57/23
flagged [5] 15/6 32/9 32/21 49/1 63/17
flags [2] 48/12 59/18
FLETC [2] 47/1 47/2

## F

**flight [2]** 48/18 63/7
**flights [1]** 86/16
**Focusing [1]** 21/8
**food [2]** 17/13 48/15
**force [4]** 56/6 56/21 58/9 61/25
**foregoing [1]** 94/12
**forensic [1]** 10/18
**Forest [1]** 68/16
**form [1]** 94/11
**former [1]** 8/24
**forwarded [2]** 50/23 60/22
**forwards [1]** 60/25
**fourth [1]** 42/7
**frame [1]** 39/2
**free [3]** 11/8 45/6 89/16
**freedom [1]** 76/9
**Friday [2]** 92/3 92/9
**friend [6]** 36/5 36/17 36/23 37/21 37/23 70/19
**front [4]** 6/16 19/18 55/14 84/6
**funeral [1]** 9/3

## G

**garment [1]** 76/16
**gather [2]** 68/8 73/15
**general [4]** 15/23 18/20 44/13 84/13
**generated [2]** 4/17 5/14
**GEORGIA [8]** 1/1 1/14 1/15 1/19 1/24 14/17 47/3 94/6
**gets [6]** 18/6 19/16 31/18 32/21 63/7 63/7
**girlfriend [1]** 70/20
**gives [2]** 7/25 57/6
**Glynco [1]** 47/3
**Gotcha [1]** 57/21
**govern [2]** 13/25 47/14
**government [17]** 8/5 8/7 9/7 10/15 10/25 11/3 34/9 37/9 38/10 39/19 40/9 41/6 42/10 49/9 66/12 79/8 90/19
**government's [20]** 10/22 11/21 24/5 24/12 24/20 24/24 29/21 30/12 30/15 30/17 50/12 54/19 54/22 55/1 55/3 55/9 84/7 84/21 90/23 92/19
**great [1]** 9/16
**ground [2]** 10/16 10/17
**grounds [1]** 10/9
**guide [1]** 5/17

## H

**H-a-w-k-i-n-s [1]** 45/17
**handcuffed [2]** 28/4 82/23
**happy [3]** 91/4 91/5 91/18
**harboring [2]** 67/15 67/25
**Harding [7]** 50/19 50/19 50/20 55/22 55/24 60/25 62/17
**harm [4]** 47/8 66/12 66/14 67/5
**Hartsfield [8]** 15/21 16/10 16/12 21/4 21/20 50/6 80/13 80/17
**Hartsfield-Jackson [2]** 16/10 80/13
**Hawkins [12]** 12/10 33/11 33/14 45/11 45/16 45/17 45/21 55/7 78/6 78/8 85/21 86/25
**he'd [1]** 39/7
**he'll [1]** 29/8
**hearing [12]** 1/6 3/21 4/14 4/14 8/16 8/23 9/8 12/5 89/22 91/5 91/8 94/11
**helpful [2]** 6/10 7/14
**hereby [1]** 94/6
**hide [1]** 73/2
**high-risk [2]** 86/5 86/11
**his.dhs [1]** 56/11
**history [5]** 38/18 86/12 88/13 88/15 88/16
**hits [8]** 59/9 59/11 59/12 59/18 59/24 60/5 60/8 60/10
**hold [3]** 20/19 31/8 77/21
**Homeland [3]** 56/13 56/15 58/4
**Honor [43]** 3/13 3/23 4/2 5/2 10/1 10/16 11/24 12/3 12/15 24/19 29/24 30/11 30/14 31/9 31/11 34/2 34/20 37/5 37/13 39/20 43/1 44/17 44/21 45/2 45/3 45/7 54/18 54/23 54/25 78/4 78/10 78/11 85/13 89/6 89/8 89/15 89/20 90/2 91/7 91/20 92/13 93/2 93/5
**HONORABLE [2]** 1/9 3/7
**hooked [1]** 31/18
**hot [1]** 86/7
**hour [2]** 5/17 78/16
**hours [3]** 55/19 62/11 77/22
**HSI [8]** 56/22 58/4 60/16 77/2 77/6 77/15 77/23 77/25
**huh [25]** 49/5 55/11 55/13 56/3 57/3 57/5 58/16 59/25 60/18 60/24 62/5 62/13 64/6 65/23 68/14 68/22 70/16 71/5 71/23 72/11 74/15 75/9 75/15 76/24 77/24
**hundred [1]** 50/5
**hurt [2]** 47/8 66/8

## I

**I'd [4]** 7/16 7/19 30/11 34/18
**I'll [10]** 6/7 11/22 29/24 34/22 38/16 41/16 41/16 89/21 91/1 91/12
**I'm [52]** 4/12 7/17 7/25 8/14 8/17 9/20 10/1 11/10 11/19 12/2 13/5 16/7 24/4 29/21 37/4 37/5 38/9 39/18 40/9 41/4 41/6 41/18 42/9 44/14 45/22 46/7 47/1 48/2 49/22 50/12 51/13 56/3 61/2 61/14 61/18 62/19 64/8 64/21 65/1 65/3 66/2 72/8 74/16 77/22 78/18 79/21 81/19 86/23 91/4 91/5 91/18 91/25
**I've [11]** 5/12 29/23 34/8 37/13 38/12 39/23 40/14 41/9 41/21 42/12 69/8
**ICE [1]** 57/4
**identical [1]** 8/7
**identification [4]** 24/25 30/18 34/9 55/4
**illegal [2]** 71/7 72/6
**imagine [3]** 8/10 9/10 90/20
**immediately [1]** 8/5
**immersing [1]** 10/10
**imply [1]** 6/20
**inappropriate [2]** 5/10 7/11
**Inc [1]** 1/17
**incident [1]** 8/25
**INDEX [2]** 1/25 2/14
**indiscernible [1]** 4/11
**individual [11]** 16/18 17/11 21/22 48/9 49/7 49/11 49/17 50/7 63/8 70/2 80/19
**individual's [1]** 20/1
**individuals [7]** 15/6 26/8 30/9 53/22 66/9 68/1 83/25
**influencing [2]** 7/2 7/17
**information [31]** 25/11 25/22 49/11 49/13 51/3 51/4 53/10 53/23 57/10 57/20 62/23 64/3 67/14 67/24 68/3 68/8 68/10 72/20 72/22 73/4 73/15 74/5 74/7 74/10 81/15 86/6 86/19 88/6 88/7 88/11 90/7
**informational [1]** 29/14
**initial [3]** 21/10 23/4 50/23
**initialed [2]** 24/10 24/10
**initially [2]** 23/18 28/24
**initiated [2]** 56/5 56/23
**input [2]** 30/22 49/11
**insensitive [1]** 9/6
**inspect [2]** 47/6 53/25
**inspected [1]** 71/1
**inspecting [2]** 47/18 48/9
**inspection [133]**
**inspections [11]** 15/3 15/5 15/10 16/11 44/5 44/7 44/10 44/11 44/15 48/1 67/9
**instances [1]** 21/6
**instructs [2]** 58/14 59/1
**intend [2]** 7/6 7/8
**intended [3]** 4/22 8/6 8/23
**intention [3]** 7/9 9/14 77/5
**interacting [2]** 54/4 54/5
**interaction [3]** 7/22 23/20 63/24
**interest [1]** 10/22
**interjected [1]** 8/19
**International [1]** 80/14
**interrogation [2]** 4/9 65/22
**interview [49]** 2/17 5/18 12/13 14/4 18/3 23/4 23/20 23/21 24/16 25/14 26/1 26/20 27/3 27/22 27/25 28/4 28/9 28/13 28/16 38/14 38/17 40/3 42/4 53/20 54/12 54/16 60/17 64/12 64/13 64/25 65/8 65/9 65/19 67/11 68/7 68/8 68/19 68/23 74/17 79/23 81/1 82/13 82/16 83/1 83/5 86/7 87/7 87/8 88/4
**interview room [1]** 64/25
**interviewed [1]** 52/8
**interviewing [1]** 80/25
**interviews [3]** 21/17 47/23 80/8
**introduce [1]** 34/21
**introduced [3]** 8/8 36/19 37/16
**intrusiveness [1]** 76/9
**investigation [9]** 16/17 17/10 23/12 56/13 58/4 58/5 58/11 66/5 67/7
**investigations [1]** 15/7
**investigative [1]** 25/3
**island [1]** 36/10
**issue [7]** 4/22 5/8 8/13 8/20 8/21 9/11 10/3
**issues [1]** 11/20
**items [11]** 27/15 37/2 47/19 48/15 53/5 58/19 67/4 67/17 67/21 69/16 71/21

## J

**J-a-s-o-n [1]** 45/16
**jacket [3]** 76/13 76/14 76/18

**J**

**Jackson [2]** 16/10 80/13
**James [1]** 31/18
**January [7]** 21/24 46/1 50/10 55/12 80/15 80/21 85/20
**January 24th [4]** 21/24 50/10 55/12 80/21
**January of [1]** 80/15
**Jason [3]** 12/10 45/11 45/16
**job [10]** 52/24 68/4 69/18 71/16 71/17 71/19 73/16 74/12 86/7 88/10
**Joe [1]** 3/14
**Joint [1]** 58/9
**JOSEPH [1]** 1/16
**journal [2]** 70/17 70/24
**JTTF [1]** 58/7
**JUDGE [11]** 1/9 3/16 7/4 31/14 31/24 34/8 39/18 40/9 41/6 42/9 92/23
**JULY [4]** 1/10 3/2 91/11 94/8
**July 19th [1]** 91/11

**K**

**Kane [6]** 8/24 9/4 9/9 9/18 87/18 89/25
**Kane's [5]** 9/2 9/10 89/23 90/6 90/17
**keel [1]** 82/17
**knowing [1]** 67/6

**L**

**L-a-r-r-y [1]** 12/24
**L-a-t-o-y-a [1]** 79/17
**laptop [2]** 31/12 67/3
**Larry [3]** 12/8 12/18 12/24
**LaToya [4]** 12/12 79/8 79/11 79/16
**law [10]** 10/17 11/8 11/17 16/16 17/21 22/5 47/9 47/18 51/20 58/15
**laws [2]** 13/22 80/3
**lead [7]** 23/3 47/4 61/9 61/17 62/2 80/25 88/21
**leading [1]** 65/3
**leads [1]** 68/9
**led [1]** 61/19
**leeway [1]** 11/19
**legal [1]** 11/13
**legally [1]** 69/17
**lenient [1]** 11/11
**letter [1]** 70/19
**letting [2]** 11/11 74/11
**limited [1]** 10/21
**lines [1]** 70/7
**list [7]** 59/20 86/7 87/2 88/3 88/6 88/23 89/1
**listen [2]** 65/8 65/10
**lobby [1]** 21/11
**lookout [22]** 15/25 15/25 16/14 16/15 16/16 17/9 17/9 18/9 22/3 23/6 32/12 32/15 32/24 33/2 43/6 43/8 43/16 43/20 49/10 49/25 59/4 63/15
**lookouts [3]** 49/4 49/6 60/5
**loud [2]** 65/12 65/17
**luggage [1]** 20/3

**M**

**machine [2]** 71/2 94/7
**MAGISTRATE [1]** 1/9
**main [1]** 19/22
**major [1]** 67/21
**majority [3]** 48/3 66/2 68/1
**managers [1]** 61/19
**Marietta [1]** 1/18
**Matt [1]** 3/11
**matter [3]** 8/3 90/11 94/8
**matters [1]** 5/15
**MATTHEW [1]** 1/13
**McGhie [5]** 56/5 56/6 56/8 56/23 58/3
**MCGRANE [7]** 1/17 2/9 3/14 8/18 76/4 91/1 93/3
**measures [1]** 86/20
**mechanical [1]** 1/20
**media [3]** 19/11 20/17 27/16
**medias [1]** 30/4
**MELISSA [2]** 1/17 3/14
**member [1]** 15/9
**members [2]** 62/8 62/9
**memory [1]** 7/17
**messages [1]** 51/16
**meters [1]** 17/2
**mic [1]** 21/16
**microphone [2]** 12/23 14/12
**middle [1]** 50/17
**Mine [1]** 56/19
**Miranda [1]** 10/11
**mirror [1]** 64/25
**mistake [1]** 54/21
**mitigate [1]** 79/24
**moment [4]** 32/2 43/1 75/21 87/24
**Monday [1]** 2/21
**month [4]** 90/7 90/16 91/8 92/5
**months [1]** 14/9
**motion [1]** 10/7
**Mr. [176]**
**Mr. Austin [5]** 31/10 34/17 89/21 91/1 93/3
**Mr. Burnham [2]** 51/14 51/17
**Mr. Carrico [12]** 4/24 7/5 8/4 8/9 9/25 11/22 34/21 44/19 79/6 89/18 91/23 92/25
**Mr. Findlay [2]** 13/4 14/11
**Mr. Hawkins [3]** 45/21 78/6 78/8
**Mr. Kane [4]** 9/4 9/9 9/18 89/25
**Mr. Kane's [4]** 9/2 9/10 90/6 90/17
**Mr. Tunick [129]**
**Mr. Tunick's [15]** 4/6 10/9 10/11 11/1 12/13 23/1 24/15 26/5 33/20 51/7 52/5 53/14 70/15 82/13 85/23
**Ms [1]** 2/9
**Ms. [4]** 8/18 76/4 91/1 93/3
**Ms. McGrane [4]** 8/18 76/4 91/1 93/3
**multiple [15]** 10/23 46/14 46/22 46/25 56/24 59/9 59/11 59/23 60/4 60/7 60/8 60/9 61/17 61/19 87/13
**multitude [7]** 48/8 48/15 62/1 66/7 66/11 66/13 67/20

**N**

**narcotics [1]** 67/1
**Nathan [2]** 51/8 57/1
**national [10]** 15/6 15/25 22/3 23/6 33/2 43/10 43/11 43/18 43/21 79/25
**nature [2]** 36/14 81/16
**necessary [4]** 8/15 8/16 9/20 73/8
**nervous [1]** 7/17
**nine [1]** 14/9
**No. [1]** 3/11
**No. 1:25-CR-499 [1]** 3/11
**Nods [3]** 65/20 70/25 75/20
**none [2]** 11/2 25/13
**nonverbal [1]** 48/11
**NORTHERN [3]** 1/1 1/14 94/5
**notice [1]** 20/16
**notification [3]** 57/25 57/25 63/14
**NTC [1]** 43/9
**number [5]** 1/5 1/5 60/2 60/22 72/9
**NW [1]** 1/18

**O**

**object [1]** 11/6
**objection [9]** 5/1 24/21 24/22 30/13 44/25 54/24 78/8 89/13 92/12
**observed [1]** 82/19
**observing [1]** 29/19
**obtained [1]** 10/13
**occupy [1]** 56/2
**October [6]** 92/6 92/7 92/10 92/16 92/20 92/21
**October 11th [1]** 92/7
**October 23rd [1]** 92/21
**October 9th [2]** 92/10 92/20
**offer [1]** 11/9
**office [2]** 1/13 62/22
**officer [82]** 12/13 13/5 13/7 13/10 13/19 14/6 16/1 16/23 23/3 23/17 29/1 31/1 32/6 32/15 32/25 33/4 33/11 33/14 37/16 37/23 38/3 38/13 39/24 40/15 40/15 41/10 41/14 41/22 41/22 42/13 42/17 43/5 44/3 44/22 44/25 45/8 48/9 49/8 49/17 49/18 49/20 50/22 52/22 52/22 55/7 56/1 56/5 56/6 56/8 56/21 59/16 59/17 62/6 62/7 62/17 63/8 63/13 63/13 64/7 69/24 70/12 72/1 79/16 79/20 79/21 79/22 80/1 80/12 81/2 81/6 81/8 81/9 82/3 82/6 82/9 85/17 85/21 86/25 88/3 88/21 89/9 89/13
**officers [37]** 18/18 18/19 27/22 28/2 28/8 44/11 44/14 47/5 47/6 52/6 52/7 53/21 53/25 54/4 54/11 56/24 57/4 58/14 59/1 60/22 61/6 61/25 61/25 62/1 62/15 63/9 65/3 65/4 68/21 71/24 71/25 72/9 72/20 76/22 82/12 82/18 82/25
**offices [1]** 94/6
**official [7]** 1/1 1/1 1/2 1/6 1/22 94/4 94/19
**Oh [6]** 4/25 5/20 51/11 57/13 57/21 65/1
**one-day [1]** 59/4
**open [4]** 9/15 9/21 89/22 94/8
**opening [2]** 91/3 92/19
**operate [1]** 90/16
**opportunity [1]** 24/12
**opposed [2]** 19/17 19/21
**option [1]** 91/6
**oral [1]** 51/14
**order [2]** 76/25 77/14
**orders [2]** 76/22 77/19
**organization [1]** 38/23
**original [1]** 91/3
**originally [1]** 8/16
**outer [1]** 76/16

**O**

**owner [1]** 20/25

**P**

**p.m [1]** 50/18
**pad [1]** 71/2
**page [2]** 1/5 2/3
**Pages [1]** 94/12
**paradigm [1]** 73/23
**part [11]** 5/18 10/14 37/1 44/15 56/15 58/14 62/24 66/3 71/16 71/17 75/12
**partial [1]** 1/8
**participate [1]** 22/5
**participating [2]** 21/21 80/18
**parties [2]** 5/15 9/9
**passcodes [1]** 59/1
**passed [1]** 9/3
**Passenger [1]** 61/24
**passengers [2]** 79/23 81/1
**password [22]** 20/13 20/15 20/18 20/21 28/15 28/18 28/21 29/2 29/5 30/20 30/22 31/4 40/16 40/22 41/1 42/24 83/17 83/19 84/22 85/2 85/6 85/8
**passwords [1]** 76/25
**pat [12]** 23/23 23/24 58/20 71/11 71/15 71/18 72/1 72/2 72/5 76/1 76/6 76/14
**pat-down [11]** 23/23 23/24 71/11 71/15 71/18 72/1 72/2 72/5 76/1 76/6 76/14
**patrol [4]** 12/11 14/21 60/20 77/10
**Patrol's [1]** 29/14
**pause [5]** 43/3 44/1 75/22 88/1 89/5
**PDF [1]** 1/1
**pedophile [3]** 25/18 25/20 82/4
**pedophiles [6]** 25/16 35/5 35/11 36/21 36/25 37/18
**pedophilia [1]** 82/1
**people [35]** 15/10 17/14 25/15 26/13 35/4 36/20 36/25 37/17 46/15 46/16 47/6 47/18 48/17 48/21 54/1 60/7 62/14 66/11 66/12 66/14 66/24 67/2 67/17 67/22 69/9 71/18 71/20 73/13 80/9 81/25 86/4 86/13 87/2 88/3 89/1
**perhaps [1]** 8/22
**period [5]** 1/3 48/3 61/22 62/9 69/19
**permission [1]** 31/25
**persist [1]** 19/8
**person [30]** 6/3 16/3 16/17 16/18 16/20 17/9 18/10 19/5 19/10 19/21 20/5 23/13 27/15 29/9 32/9 32/21 48/9 49/11 49/15 50/1 59/20 63/17 73/2 73/21 74/11 81/6 86/21 87/15 88/8 88/9
**person's [1]** 16/19
**personal [2]** 58/18 70/17
**pertinent [1]** 27/15
**phone [24]** 10/13 10/19 11/1 11/2 28/15 30/23 31/5 40/17 42/24 58/20 67/3 67/3 77/16 83/14 83/17 83/19 83/20 83/23 84/22 85/2 85/6 85/7 85/8 86/14
**photo [2]** 88/8 88/9
**photocopies [1]** 70/24
**photocopy [1]** 70/22
**picture [2]** 57/7 57/17
**piece [3]** 25/22 53/10 86/19
**pigeonholed [1]** 67/10
**place [5]** 22/11 23/4 49/23 77/15 80/6
**Plaintiff [2]** 1/4 1/13
**plan [1]** 90/11
**planning [1]** 10/25
**plans [1]** 10/15
**Plata [1]** 35/21
**play [12]** 7/6 7/9 8/8 8/15 37/4 37/6 39/18 40/9 41/16 41/16 41/18 42/9
**playable [1]** 8/5
**played [8]** 37/11 38/11 39/14 39/22 40/13 41/8 41/20 42/11
**playing [2]** 38/9 41/6
**podium [1]** 18/14
**point [24]** 4/5 25/14 26/1 26/20 27/21 28/16 45/23 53/13 53/14 54/8 57/22 64/9 64/19 67/13 68/23 74/13 75/9 82/6 82/9 82/12 82/21 82/23 83/7 90/18
**policies [3]** 13/24 47/14 80/5
**political [2]** 38/21 39/3
**poor [2]** 4/9 4/20
**porn [2]** 67/15 67/25
**pornography [12]** 26/3 26/6 26/10 26/15 35/1 35/8 40/23 41/2 53/8 81/25 82/7 86/14
**port [3]** 48/4 50/22 56/1
**position [3]** 11/21 12/4 56/2
**possessed [1]** 35/7
**possessing [1]** 82/7
**post [4]** 4/14 60/19 91/5 91/7
**potential [1]** 15/7
**precedence [1]** 4/15
**preclude [1]** 10/8
**preliminary [1]** 4/2
**present [9]** 12/13 22/23 23/13 23/16 25/7 27/22 31/2 52/25 82/13
**presiding [1]** 3/7
**pretrial [1]** 5/3
**pride [1]** 62/2
**prim [1]** 59/9
**primary [28]** 12/9 15/15 15/15 15/18 15/21 16/25 17/3 17/7 17/16 22/20 23/3 33/24 46/16 48/8 50/2 50/4 59/11 59/12 59/16 59/16 59/24 60/8 60/10 63/4 63/8 63/18 63/21 63/24
**privacy [2]** 19/15 19/15
**private [13]** 18/3 18/15 19/12 19/21 21/8 21/17 23/7 23/9 23/23 24/17 33/8 33/15 33/20
**privy [1]** 77/22
**probable [1]** 10/20
**problem [1]** 78/14
**problems [1]** 7/24
**procedures [2]** 13/24 80/6
**proceed [3]** 10/15 18/10 27/14
**proceeded [3]** 23/11 23/11 27/7
**proceedings [8]** 1/10 1/20 43/3 75/22 93/8 94/8 94/10 94/13
**process [3]** 84/1 84/3 84/13
**producing [1]** 87/21
**Professional [2]** 28/1 28/3
**Program [1]** 1/17
**prohibited [9]** 1/7 20/11 37/2 47/19 48/15 52/15 67/4 69/16 71/20
**projector [2]** 31/19 31/21
**prompt [1]** 31/6
**prong [1]** 19/4
**property [2]** 20/1 20/5
**proposition [2]** 11/14 11/17
**protect [1]** 69/18
**protected [2]** 20/14 20/15
**Protection [7]** 13/5 13/7 45/23 49/7 50/22 52/10 55/25
**Puerto [1]** 35/21
**pull [1]** 88/9
**pulled [1]** 43/15
**purposes [6]** 24/25 26/12 30/18 55/4 89/22 90/4
**pursuant [1]** 28/21

**Q**

**quality [1]** 4/20
**question [9]** 19/19 31/15 36/22 48/14 50/1 70/4 76/21 88/15 91/6
**questioned [2]** 19/22 22/20
**questioner [1]** 12/9
**questioning [8]** 10/10 18/16 18/19 19/9 33/18 35/1 66/4 67/12
**questions [60]** 7/9 11/5 16/3 18/25 19/3 25/4 25/4 25/8 26/24 27/4 27/7 27/9 27/11 31/9 38/18 39/11 43/23 44/17 48/10 48/10 49/13 52/7 52/11 52/12 52/16 52/17 52/23 53/1 54/18 67/11 67/19 68/21 68/25 69/3 69/14 69/17 69/21 69/25 70/4 72/9 73/3 73/4 73/7 73/11 73/18 73/19 73/24 74/8 74/14 75/24 81/3 81/9 81/12 81/14 83/11 84/15 84/17 84/19 85/1 85/12
**quick [4]** 18/9 55/21 78/17 78/20
**quickly [2]** 31/16 57/23

**R**

**raise [4]** 12/16 44/19 45/9 79/9
**random [1]** 60/7
**randomly [3]** 17/14 48/17 48/23
**ray [1]** 71/2
**re [1]** 27/12
**re-entering [1]** 27/12
**recently [1]** 5/13
**recess [2]** 79/1 93/7
**recognize [2]** 24/5 34/13
**recollection [6]** 6/13 6/15 6/22 7/1 7/3 7/20
**reconsidered [1]** 11/17
**record [9]** 6/17 6/18 12/22 16/9 34/19 45/15 79/4 79/15 94/13
**recorded [4]** 1/20 21/18 23/22 24/2
**recording [10]** 6/19 24/8 37/11 38/11 39/22 40/13 41/8 41/20 42/11 65/21
**recordings [2]** 2/17 24/15
**redirect [1]** 44/20
**reduced [1]** 94/11
**references [1]** 50/24
**referencing [1]** 1/5
**referrals [2]** 22/13 52/1
**refresh [4]** 6/14 6/22 6/25 7/20
**refreshing [1]** 6/13
**refuse [3]** 19/4 27/11 29/10
**refuses [2]** 19/2 27/8
**regular [5]** 60/6 65/15 67/11 69/20

## R


regular... [1] 73/2
relative [1] 39/3
rely [1] 91/3
remind [1] 36/20
reply [3] 92/14 92/20 92/20
reporter [6] 1/3 1/6 1/22 4/18 94/4 94/19
REPORTERS [1] 93/12
representation [1] 9/12
Republic [4] 35/19 36/7 55/17 72/13
request [3] 10/11 17/21 20/18
requests [1] 49/4
required [1] 11/2
research [1] 49/24
reset [2] 31/6 31/6
respectful [1] 53/23
response [13] 15/1 26/23 26/25 27/6 27/8 43/12 44/4 61/12 61/13 61/14 61/15 61/24 91/23
restricted [1] 1/3
result [1] 4/10
retain [3] 58/23 76/23 77/15
reveal [1] 37/20
review [2] 24/12 65/21
rights [1] 10/10
rise [3] 3/6 78/25 79/2
risk [2] 86/5 86/11
RMR [2] 1/22 94/18
roadmap [1] 11/25
role [6] 23/1 45/24 46/1 52/4 55/24 80/23
roles [1] 14/20
room [27] 18/15 19/12 19/21 23/8 23/13 23/21 23/24 23/25 24/1 24/17 33/9 33/15 33/21 63/7 64/12 64/13 64/15 64/19 64/25 65/1 65/5 65/9 65/25 71/22 74/18 74/22 75/7
rooms [6] 18/3 19/14 19/17 21/8 21/13 21/17
rules [4] 13/24 47/13 48/22 80/5


## S


S' [1] 2/15
safety [2] 71/17 71/21
Sam [1] 32/24
samples [1] 66/11
SAMUEL [8] 1/5 3/10 21/22 50/8 50/24 79/5 80/19 94/9
schedule [2] 90/5 90/15
scheduled [2] 55/17 62/12
school [1] 72/25
scooting [1] 14/11
screen [1] 31/6
search [20] 10/14 10/18 11/1 11/14 18/9 21/3 26/2 27/14 27/15 27/16 28/19 28/22 47/23 71/6 83/13 83/17 83/23 87/2 87/5 88/24
searched [4] 20/25 26/18 30/9 83/20
searches [7] 10/21 13/25 19/25 20/10 20/13 29/15 80/6
searching [8] 11/2 19/9 19/10 19/10 20/12 20/17 26/9 84/3
seat [1] 18/8
second [9] 4/8 4/22 8/20 8/21 10/12 10/17 31/8 40/6 64/21
secondary [109]
seconds [1] 38/10
section [2] 57/13 57/19
sections [1] 4/10
Security [3] 56/13 56/15 58/4
seeking [2] 10/8 54/19
seize [1] 40/17
seizure [1] 10/14
selected [1] 48/23
selling [1] 67/23
sense [5] 5/22 5/22 57/6 60/9 76/9
sentences [1] 9/13
September [4] 91/13 91/15 91/21 92/19
September 18th [3] 91/15 91/21 92/19
September 19 [1] 91/13
serve [3] 14/6 14/16 14/18
served [1] 45/24
serving [1] 46/1
session [3] 3/1 3/7 79/3
seven [1] 13/8
sexually [1] 67/2
share [2] 25/23 53/11
shirt [2] 76/17 76/18
short [6] 12/3 41/16 73/1 73/3 73/17 74/6
shouting [1] 65/12
shut [1] 85/11
side [2] 57/19 65/4
signaled [1] 75/3
signed [2] 24/10 24/10
site [2] 60/16 77/2
situation [2] 5/25 7/23
situations [1] 86/13
Sixth [1] 10/10
skills [1] 68/7
slash [1] 18/2
small [1] 73/1
snippets [1] 88/14
somebody's [1] 67/3
someone's [1] 21/3
sounds [5] 9/19 36/11 60/1 68/20 92/8
South [1] 47/2
special [4] 13/19 46/24 48/2 80/1
specialized [2] 14/20 46/18
specific [5] 21/2 43/11 67/14 67/24 68/2
specifies [2] 58/3 61/8
specify [1] 64/24
spell [3] 12/21 45/15 79/14
spreading [1] 66/10
spring [1] 92/1
stand [3] 61/11 63/4 79/9
standard [6] 26/25 27/8 28/20 29/9 81/12 83/22
standing [1] 16/7
stands [2] 56/13 59/7
starts [2] 11/5 49/24
state [4] 10/24 12/21 45/15 79/14
stated [2] 71/20 74/11
statement [1] 7/2
statements [1] 10/8
STATES [16] 1/1 1/3 1/14 3/10 3/12 27/12 47/7 66/12 66/14 73/22 79/5 79/24 89/19 93/1 94/5 94/9
stationed [6] 14/8 46/6 46/7 46/8 80/11 80/15
stay [1] 81/16
stayed [3] 36/2 36/3 48/19
staying [2] 35/24 72/12
Stenograph [1] 94/7
stenography [1] 1/20
step [3] 44/22 78/6 89/9
stipulate [1] 9/9
stipulation [4] 9/8 9/16 9/18 89/23
stopped [7] 37/13 38/12 39/23 40/14 41/9 41/21 42/12
Street [1] 1/18
submitting [1] 5/16
sufficient [1] 69/18
suggesting [1] 7/3
suggests [1] 6/1
Suite [1] 1/18
supervise [1] 46/14
supervising [4] 46/19 46/20 50/7 52/6
supervisor [19] 12/11 23/7 23/17 33/8 33/11 33/17 33/19 33/23 46/2 46/3 46/5 46/8 46/12 46/23 52/10 61/4 61/5 61/19 85/20
supervisors [1] 48/3
supplementing [1] 89/22
support [1] 4/7
suppressed [1] 10/13
suppression [1] 3/21
Supreme [1] 11/18
suspect [2] 25/20 26/5
suspected [5] 58/11 66/5 68/12 68/15 88/19
suspicion [1] 10/21
SW [2] 1/15 1/23
sweater [3] 76/13 76/15 76/18
sworn [3] 12/19 45/12 79/12
system [4] 48/12 49/9 49/10 86/6
systems [2] 13/11 63/6


## T


t-shirt [2] 76/17 76/18
table [5] 18/2 18/14 21/15 75/14 75/17
tactical [10] 14/25 15/1 43/12 44/4 61/12 61/13 61/14 61/15 61/24 86/3
tailor [1] 11/8
target [2] 15/25 23/6
targeted [1] 60/2
Targeting [8] 15/6 22/3 23/6 33/2 43/10 43/11 43/18 43/21
task [4] 56/6 56/21 58/9 61/25
team [17] 14/25 15/1 43/11 43/12 44/4 46/18 61/8 61/12 61/13 61/14 61/15 61/24 62/4 62/6 62/8 77/25 87/6
teams [3] 61/17 61/19 61/21
tear [1] 20/16
tear-off [1] 20/16
tech [1] 31/12
technically [1] 61/3
techniques [1] 68/7
techs [1] 49/10
Ted [2] 1/15 1/23
term [4] 16/16 18/24 52/17 86/9
terms [1] 20/12

## T

**terrorism [16]** 43/12 44/4 58/9 61/13 66/5 66/5 66/8 66/13 67/7 68/6 68/13 68/15 79/25 86/3 86/22 88/20
**terrorist [7]** 14/25 15/1 15/7 58/12 59/20 66/18 66/21
**test [1]** 32/3
**testimony [4]** 9/10 11/1 11/3 89/23
**text [1]** 51/16
**Thank [28]** 9/24 12/14 12/21 13/1 14/14 29/25 34/5 44/18 44/23 45/4 45/5 45/7 45/7 45/14 45/18 50/14 54/22 78/6 78/7 78/12 79/14 85/14 89/10 89/11 89/16 89/17 91/10 93/2
**Thanks [1]** 93/6
**thinking [1]** 91/14
**THOMAS [3]** 45/11 45/16 45/17
**thorough [3]** 17/10 71/17 74/12
**thoroughly [2]** 73/6 74/10
**thought [2]** 9/5 11/7
**Threat [3]** 61/14 61/15 61/24
**threaten [4]** 27/22 53/15 53/17 82/13
**threats [1]** 79/25
**time [53]** 8/25 9/6 9/7 9/21 22/20 23/3 27/21 38/1 38/3 39/2 39/13 40/6 41/4 41/6 42/1 42/7 46/21 46/21 48/3 48/5 49/23 51/1 53/13 53/14 54/8 56/4 57/16 60/11 61/20 61/22 62/8 62/18 62/22 62/25 63/1 64/10 64/22 66/2 67/13 69/19 69/23 71/8 81/1 82/3 82/6 82/9 82/12 82/21 82/23 83/7 85/4 90/18 91/19
**times [4]** 39/15 42/22 46/22 87/13
**tiny [1]** 14/12
**today's [1]** 90/4
**tone [7]** 27/24 28/2 53/19 65/15 82/15 82/17 82/18
**topic [1]** 37/17
**Toronto [2]** 14/7 14/8
**total [1]** 75/1
**totally [1]** 9/6
**trainings [1]** 47/20
**transcript [24]** 1/1 1/4 1/7 1/8 1/10 1/21 4/8 4/10 4/13 4/19 5/4 5/25 6/3 6/9 6/12 6/14 7/1 7/17 7/18 7/24 90/8 90/16 91/12 94/12
**transcripts [1]** 1/2
**travel [9]** 46/16 52/15 70/6 72/18 81/14 86/11 88/7 88/13 88/15
**travel-related [1]** 81/14
**traveler [4]** 15/14 15/16 20/16 81/15
**traveling [3]** 36/10 60/1 81/15
**travels [1]** 86/5
**Travis [2]** 56/6 56/23
**treated [1]** 53/24
**tree [1]** 38/25
**trip [6]** 18/22 35/14 35/14 35/18 35/25 86/18
**TTRT [11]** 15/1 15/3 15/5 15/9 44/12 44/13 44/15 61/8 61/11 62/4 62/6
**TUNICK [139]**
**Tunick's [15]** 4/6 10/9 10/11 11/1 12/13 23/1 24/15 26/5 33/20 51/7 52/5 53/14 70/15 82/13 85/23
**Turner [2]** 1/15 1/23
**two-hour [1]** 5/17
**two-prong [1]** 19/4
**typewritten [1]** 94/11
**typical [2]** 25/22 53/10
**typically [6]** 18/6 18/8 25/8 53/1 66/25 81/10
**typos [1]** 4/11

## U

**U.S [22]** 1/13 1/23 13/5 13/6 13/9 13/16 13/19 13/22 13/25 14/6 14/21 17/21 19/5 19/7 27/11 46/23 47/8 47/10 66/15 79/22 80/3 80/11
**uh [25]** 49/5 55/11 55/13 56/3 57/3 57/5 58/16 59/25 60/18 60/24 62/5 62/13 64/6 65/23 68/14 68/22 70/16 71/5 71/23 72/11 74/15 75/9 75/15 76/24 77/24
**uh-huh [25]** 49/5 55/11 55/13 56/3 57/3 57/5 58/16 59/25 60/18 60/24 62/5 62/13 64/6 65/23 68/14 68/22 70/16 71/5 71/23 72/11 74/15 75/9 75/15 76/24 77/24
**ultimately [3]** 30/20 42/20 77/8
**understanding [5]** 3/20 3/22 5/2 10/6 10/7
**unfortunately [1]** 9/2
**unit [8]** 14/25 20/20 29/6 46/15 61/2 61/25 86/3 86/22
**UNITED [16]** 1/1 1/3 1/14 3/9 3/11 27/12 47/7 66/12 66/14 73/22 79/5 79/24 89/19 93/1 94/5 94/9
**units [1]** 44/3
**unless [1]** 69/19
**unlock [1]** 29/10
**unreasonable [1]** 10/14
**untoward [1]** 8/11
**unusual [7]** 22/14 52/2 53/4 63/23 63/25 81/17 81/20
**unwillingness [1]** 27/4
**updates [2]** 47/17 47/20
**us [6]** 20/18 31/12 58/1 64/2 64/16 69/10

## V

**vacation [1]** 74/4
**venue [1]** 11/4
**version [1]** 57/18
**versions [1]** 8/6
**vet [1]** 86/7
**via [1]** 9/5
**video [30]** 4/9 4/15 4/19 5/5 5/21 5/24 6/5 6/22 6/23 6/25 7/6 7/9 7/14 7/15 7/22 8/4 8/11 12/4 21/18 23/21 36/21 37/11 38/11 39/22 40/13 41/8 41/15 41/20 42/11 65/21
**videos [6]** 8/5 8/12 8/12 8/15 67/2 90/24
**violated [1]** 10/12
**visible [3]** 28/11 54/14 83/3
**volume [1]** 32/3

## W

**W's [2]** 52/18 52/19
**walk [1]** 17/3
**walking [2]** 18/13 50/1
**warnings [1]** 10/11
**warrant [1]** 10/19
**watch [2]** 59/20 71/4
**watching [1]** 36/14
**welcome [1]** 12/15
**well-established [1]** 10/18
**whale [1]** 36/14
**whatsoever [1]** 10/21
**Whenever [1]** 59/15
**wipe [2]** 31/6 31/6
**withdraw [1]** 38/16
**witness's [4]** 6/13 6/14 6/25 7/2
**witnessed [1]** 54/4
**witnesses [5]** 10/15 12/1 12/3 12/6 12/8
**wrapped [1]** 90/17
**WYNETTE [3]** 1/22 94/4 94/18

## X

**x-ray [1]** 71/2

## Y

**yards [1]** 50/5
**yep [3]** 31/13 84/6 92/11
**you'd [5]** 44/19 48/20 53/24 65/12 67/10

## Z

**Zoom [1]** 9/5