IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*v.*<br>SAMUEL TUNICK | Criminal Action No.<br>1:25-CR-499 |

**Government's Response to Defendant's Post-Hearing Brief of Motions to Suppress Evidence and Statements**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Matthew S. Carrico and Kassi N. Conley, Assistant United States Attorneys for the Northern District of Georgia, files this Response to Defendant's Post-Hearing Brief of Motions to Suppress Evidence and Statements. Because the Eleventh Circuit has held that the border-search doctrine allows for the warrantless searches of electronic devices, because the primary statement at issue was not confessional in nature, but in and of itself constitutes the crime charged, and because Defendant's statements were voluntary and not made while he was in custody, Defendant's motions to suppress should be denied.

## Background

### A. Procedural History

On November 13, 2025, a grand jury in the Northern District of Georgia returned a single count indictment charging Defendant with destroying the contents of his cellular phone for the purpose of preventing the Government's lawful authority to seize the contents of said phone, in violation of Title 18, United States Code, Section 2232(a). (Doc. 1.) Defendant was arrested, made his initial appearance and was arraigned in this case, and was released on bond on December 3, 2025. (Doc. 8.)

On March 17, 2026, Defendant filed his Motion to Suppress Evidence and Statements. (Doc. 21.) On March 19, 2026, the Court conducted a pretrial conference where it scheduled an evidentiary hearing on Defendant's Motion to Suppress. (Doc. 22.)

On July 20, 2026, the Court held an evidentiary hearing as to Defendant's Motion to Suppress. (Doc. 31.) At the hearing, the Government called three witnesses: (1) U.S. Customs and Border Patrol ("CBP") Officer Larry Findlay; (2) CBP Chief Jason Thomas Hawkins; and (3) CBP Officer Latoya Castro. (Doc. 34.) Defendant did not call any witnesses. (*Id.*) The Government also entered the following exhibits into evidence: a recording of Defendant's interview with CBP

officers, (*Id.*, Gov't Exhs. 1-3.); a CBP informational brochure regarding electronic device searches, (*Id.*, Gov't Exh. 4.); and an e-mail between Chief Hawkins and others. (*Id.*, Gov't Exh. 5.) Defendant did not enter any exhibits into evidence. (*Id.*).

On October 19, 2026, Defendant filed his Post-Hearing Brief on Motions to Suppress Evidence and Statements. (Doc. 41.) In his brief, Defendant argues that: (1) his Fifth Amendment rights were violated when he was interviewed at the border without being provided *Miranda* warnings; (2) his Fifth and Sixth Amendment rights were violated when he was not allowed to speak with his attorney during his border interview; and (3) evidence obtained from Defendant's cell phone should be suppressed as a product of an unreasonable search under the Fourth Amendment. (*Id.*) The Court ordered the Government to respond to Defendant's Motions to Suppress Evidence and Statements by November 9, 2026. (Doc. 38.)

**B. Facts**

On January 24, 2025, at 4:23 p.m., CBP Officer/Homeland Security Investigations Task Force Officer ("TFO") Travis McGhie, sent an e-mail to CBP officials at the Atlanta Port of Entry (Hartsfield-Jackson Int'l Airport) that said Defendant was scheduled to arrive in Atlanta that evening on a Delta Airlines

flight. (Doc. 34, Gov't Exh. 5). TFO McGhie stated that "Tunick is under investigation by HSI/JTTF for suspected terrorist activities. Please have Baggage secondary conduct 100% baggage exam, retain all electronics and collect passcodes." (*Id.*) Such requests are commonly referred to as "lookouts." (Doc. 34 at 22, 48). Four minutes later, Chief CBP Officer Charles Harding responded to McGhie's e-mail stating that, "SCBPO Hawkins and his TTRT team will take the lead on this inspection." (Doc. 34, Gov't Exh. 5.) Chief Hawkins was copied on that e-mail. (*Id.* and Doc. 34 at 51.)

That evening, when Defendant arrived at primary customs inspection at Hartsfield-Jackson Int'l Airport he was referred to secondary inspection and escorted there by a CBP officer. (Doc. 34 at 33.) The walk from primary to secondary inspection is no more than forty meters, and Defendant was not questioned while being escorted from primary to secondary inspection. (*Id.* at 16-17, 50). Upon arriving in secondary inspection, Defendant was taken to a private room for secondary inspection by CBP Officer Larry Findlay, who was the primary officer conducting the inspection, and CBP Officer Latoya Castro, who assisted Officer Findlay. (*Id.* at 23, 33, 64.) The private room was approximately 10 feet by 15 feet and equipped with both video and audio recording, which captured the entirety of Defendant's secondary inspection other

than a brief physical pat down while Defendant was fully clothed. (*Id.* at 21, 23-24 and Doc. 34, Gov't Exhs. 1-3.) Defendant was referred to secondary inspection solely because of the lookout that had been put in place earlier that day. (Doc. 34 at 22, 51, 88.) Officer Findlay and his team were not made aware of the reasons for the lookout. (*Id.*)

At the time of Defendant's secondary inspection, Officer Findlay had been a CBP Officer for approximately seven years. (*Id.* at 13.). Officer Findlay was a member of CBP's tactical terrorist response team ("TTRT") and had received training in: U.S. customs laws; rules, policies, and procedures that govern border searches; and how to conduct border interviews. (*Id.* at 13-15). As a member of the TTRT, one of Officer Findlay's duties was to conduct secondary inspections of travelers entering the United States. (*Id.* at 15.)

Officer Findlay was assisted in his inspection of Defendant by CBP Officer Latoya Castro. Officer Castro, who was also a member of the TTRT, had also received training in: U.S. customs laws; rules, policies and procedures that govern border searches; and how to conduct border interviews. (*Id.* at 80.)

Finally, Chief CBP Officer Jason Hawkins was on scene to supervise Officer Findlay's inspection, and he participated in a portion of the inspection. (*Id.* at 45, 52.) Chief Hawkins was a supervisory officer at the time of the inspection and

had been a supervisory officer for approximately five years. (*Id.* at 46.) As a supervisor, Chief Hawkins's duties included supervising the secondary inspection area. (*Id.*) Chief Hawkins had received training in: U.S. customs laws; rules, policies and procedures that govern border searches; and how to conduct border interviews. (*Id.* at 47.)

Part of Officer Findlay's secondary inspection of Defendant consisted of an interview. Officer Findlay and his colleagues asked Defendant standard questions that are asked of all travelers subject to secondary inspection, commonly referred to as the "five w's," focusing on the "who, what, when, where, [and] why" of Defendant's travel outside of the United States. (*Id.* at 18-19, 25, 52, 81.) Officer Findlay and his colleagues were not provided any background information on Defendant and were not told to ask any specific question of Defendant. (*Id.* at 25, 51-52, 81.) The interview lasted for approximately 41 minutes. (Doc. 34, Gov't Exh. 1.)

Additionally, as part of Officer Findlay's secondary inspection of Defendant, a search of Defendant's property was conducted. Such searches are standard in secondary inspection, (*Id.* at 19-20), and include a traveler's luggage, property on their person, and electronic devices. (*Id.*) When conducting such searches CBP officers are looking for any prohibited items. (*Id.* at 20.) Specific to electronic

devices, if the electronic device is password protected CBP officers provide the traveler with what they call a "tear-off sheet" that explains: (1) CBP's authority to search the traveler's electronic devices; (2) that CBP will request the passcode for the device; and (3) that if the traveler refuses to provide the password, CBP will hold on to the device until CBP is able to get into the device and inspect it, after which the device is returned to the owner. (*Id.* at 20-21 and Doc. 34, Gov't Exh. 4.)

During Officer Findlay's interview of Defendant, Officer Findlay informed Defendant that one of the things CBP looks for in conducting secondary inspections is "people involved with pedophiles and stuff like that." (Doc. 34, Gov't Exh. 1 at 19:49:04.) It is common to inform individuals in secondary inspection that the officers are looking for contraband items, including child pornography. (*Id.* at 53, 67-68, 81-82.) Officer Findlay told Defendant that they were not accusing him of anything. (*Id.* at 82 and Doc. 34, Gov't Exh. 1 at 19:49:04.) Defendant told Officer Findlay that he was traveling in the Dominican Republic before returning to the United States and where he traveled while in the Dominican Republic. (Doc. 34, Gov't Exh. 1 at 19:49:29.) Defendant said that he was staying with a friend while traveling, but declined to provide the friend's name, and indicated that he did not want to continue answering questions

without a lawyer. (*Id.* at 19:51:18.) Officer Findlay continued with his interview, asking Defendant routine questions about his employment, education, and other background questions. (*Id.* at 19:52:16.)

Throughout the interview, Defendant demonstrated that he was comfortable refusing to answer Officer Findlay's questions, at one point telling him, "I just don't want to answer any more questions." (*Id.* at 19:54:33.) Officer Findlay responded by explaining that he needed to get as much information as he could from Defendant as part of his inspection, and that the sooner he got the information, the sooner Defendant could leave. (*Id.* at 19:54:47.) Defendant responded by asking if he could call a lawyer. (*Id.* at 19:55:05.) Officer Findlay ignored Defendant's question and proceeded to question him about his travel history. (*Id.*)

Officer Castro confirmed with Defendant that he was not willing to discuss who he was traveling abroad with and then asked more generally what Defendant was not willing to discuss with them as part of their inspection. (*Id.* at 19:57:39.) Defendant responded by saying that he had not committed any crime, which Officer Castro acknowledged, and said he objected to "his rights being violated like this." (*Id.*) Officer Castro explained that whenever someone enters the United States from another country that person is subject to inspection. (*Id.*)

She stated that CBP officials are always asking questions to make sure that things like drug smuggling are not going on, but again specified "we're not accusing you, you know, or anything like that, but we're asking questions to do this inspection." (*Id.*) Officer Castro further explained the inspection process, that Defendant's reluctance to answer questions caused Officer Findlay and Officer Castro to have further questions, and asked again what Defendant was not willing to talk about. (*Id.*) Defendant responded by saying he did not want to talk to them at all. (*Id.*)

Officer Castro left the interview room to get the "tear-off sheet" to provide to Defendant, explaining: (1) CBP's authority to search his electronic devices; (2) that CBP would request the passcode for his devices; and (3) if Defendant refused to provide the passwords to his devices, CBP would hold on to the devices until CBP was able to get into the devices and inspect them, after which the devices would be returned to Defendant. When she returned, Officer Castro handed Defendant the "tear-off sheet" to review. (*Id.* at 20:00:55, Gov't Exh. 4.) Officer Castro explained that Defendant could provide them with his password, they could open his phone and check for contraband, and then he would be on his way, or he could refuse to do that and they would seize his phone, and they would have to break into it before they could return it to him. (*Id.*)

Defendant reviewed the "tear-off sheet" and asked if he could call his lawyer. (*Id.*) Officer Castro said, "Not at this moment, no." (*Id.* and Doc. 34 at 84.) She then explained again that if he did not provide the password, they would take the phone for several weeks, but that he would get it back. (*Id.*) Defendant took several minutes to review the "tear-off sheet." (*Id.*) Officer Castro offered Defendant something to drink and explained that they were just trying to get him to answer the same questions they ask everyone about his trip with a little more detail and to make sure he was not in possession of child pornography. (*Id.*) Defendant said he still did not want to answer any questions. (*Id.* at 20:04:36.)

Officer Castro again asked if Defendant was going to provide his password, and he asked what the alternative was. (*Id.* at 20:04:50.) Officer Castro explained once more that they would seize Defendant's phone and give it back to him once they were able to get into the phone. (*Id.*) Defendant said he did not understand why he was not allowed to call his lawyer. (*Id.* at 20:05:10.) Officer Findlay and Officer Castro explained that Defendant was not under arrest, he was only subject to border inspection, which is administrative rather than criminal, and in that situation, he was not entitled to a lawyer. (*Id.* and Doc. 34 at 69.) After yet another discussion of what would happen if Defendant provided his password

versus if he did not provide his password, Officer Castro asked Defendant for his password and Defendant responded, "I'm trying to decide if I'm going to give it to you." (Doc. 34, Gov't Exh. 1 at 20:07:02 and Doc. 34 at 84.)

The explanations provided to Defendant throughout these discussions by Officer Castro were standard explanations provided to every individual whose electronic devices are going to be searched at the border. (Doc. 34 at 83.) Additionally, Defendant read and appeared to understand the "tear-off sheet." (*Id.* at 84.)

After another brief discussion of Defendant's travel history, Officer Castro again asked if Defendant wanted to provide his password. (*Id.*, Exh. 1. at 20:08:07.) Defendant responded, "sure." (*Id.*) He then provided the password, "Killmenow. K-I-L-L-M-E-N-O-W." (*Id.*) Officer Castro put the password into the phone, and it shut off the phone. (Doc. 34, Gov't Exh. 1 at 20:08:07 and Doc. 34 at 85.)[1]

Officer Findlay, Officer Castro, and Chief Hawkins conducted a search of Defendant's property, which included his baggage and personal property. (Doc.

---

[1] It is the Government's contention that the password provided by Defendant caused the contents of Defendant's phone to be deleted so that law enforcement could not lawfully seize and review the contents of the phone.

34 at 70-71 and Doc. 34, Gov't Exh. 1 at 20:14:22.) The officers did not find anything illegal or contraband in Defendant's belongings. (Doc. 34 at 71.) Finally, Officer Findlay and Officer Hawkins conducted a pat down of Defendant in another room. (*Id.* at 71-72.) Defendant informed the officers that he did not consent to the pat down. (*Id.*) The officers did not find anything illegal on Defendant's person. (*Id.*)

Officer Findlay, Officer Castro, and Chief Hawkins were professional and courteous throughout their interactions with the Defendant. (Doc. 34, Gov't Exh. 1.) They did not raise their voices at any time, they did not threaten Defendant, attempt to intimidate Defendant in any manner, or accuse Defendant of any crimes. (Doc. 34 at 27-28, 54, 82 and Doc. 34, Gov't Exh. 1.) Finally, at no point in time was Defendant placed under arrest, handcuffed, or restrained in any manner. (Doc. 34 at 54, 82 and Doc. 34, Gov't Exh. 1.)

At the conclusion of the border inspection of Defendant, FBI TFO Nathan Burnham and FBI SA Andrea Coble came into the room to speak with Defendant. (*Id.* at 74-75.) After introducing themselves, TFO Burnham informed Defendant that he was not under arrest, and that if his border inspection was complete, he was free to leave. (Doc. 34, Exh. 2 at 20:35:15.) Defendant told TFO Burnham that he did not wish to speak with him. (*Id.* at 20:35:54.) TFO Burnham

informed Defendant that they would be seizing his electronic devices as evidence and offered to answer any questions he had about that. (*Id.* at 20:36:01.) Defendant was provided a receipt for his devices and allowed to pack up and leave. (*Id.* at 20:38:00.)

## Argument and Citation of Authority

### A. The Fourth Amendment Does Not Require a Warrant or Any Suspicion for Forensic Searches of Electronic Devices at the Border.

Binding Eleventh Circuit precedent forecloses any argument that CBP officers needed a warrant or any suspicion at all to conduct a forensic search of Defendant's cell phone at the border. *See United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018) (holding that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border"); *United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018) (concluding that a forensic search of a cell phone at the border "required neither a warrant nor probable cause"). Therefore, there is no basis for Defendant's claim that evidence obtained from his cell phone should be suppressed as the product of an unreasonable search under the Fourth Amendment.

The border search doctrine has existed since the founding of our country, and it remains in effect today.[2] The Fourth Amendment provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. But at the nation's border, "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith[.]" *United Staes v. Flores-Montano*, 541 U.S. 149, 152 (2004). Thus, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Id.* at 152–53 (quotation marks and citation omitted). The recognition of this heightened interest in border security dates back to the founding of the Republic: "The First Congress—the same one that proposed the Fourth Amendment—empowered customs officials to stop and search without a warrant any vessel or cargo suspected of illegally entering our

[2] Border searches need not take place at the actual border but may occur at places considered the "functional equivalent" of a border, such as at an airport where international flights arrive. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).

nation." *Touset*, 890 F.3d at 1232 (citing Act of July 31, 1789, ch. 5, § 24, 1 Stat. 29, 43 (1789), and *United States v. Ramsey*, 431 U.S. 606, 616-17 (1977)). Because of the Government's strong interest in national self-protection, routine searches of travelers and their belongings at an international border "are not subject to any requirement of reasonable suspicion, probable cause, or warrant[.]" *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

The Eleventh Circuit has stated in no uncertain terms that the forensic search of an electronic device at the border does not require a warrant, nor any level of suspicion. *United States v. Pulido*, 133 F.4th 1256, 1274–75 (11th Cir.), *cert. denied*, 146 S. Ct. 396 (2025); *Touset*, 890 F.3d at 1231. Further, the Eleventh Circuit has explained that its precedent does not restrict the border search doctrine to searches for contraband, but rather, it is categorical in nature. *See, e.g.*, *Vergara*, 884 F.3d at 1312 ("[W]e require reasonable suspicion at the border only for highly intrusive searches of a person's body[.]" (quotation marks and citation omitted)); *Touset*, 890 F.3d at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."); *id.* at 1234 ("Property and persons are different."); *id.* at 1231 ("[T]he Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.").

In *United States v. Touset*, the Eleventh Circuit explicitly stated that the United States does not need reasonable suspicion to search a person's belongings, including electronic devices, at the border. There, like in this case, a "lookout" was placed on the defendant because there was suspicion that he possessed evidence of a crime — in that case, child sexual abuse materials, in this case, evidence of domestic terrorism. *Id.* at 1230. When the *Touset* defendant entered the country, agents detained a camera, two laptops, two external hard drives, and two tablets. *Id.* A later forensic search and analysis showed that the defendant possessed child sex abuse materials. *Id.* at 1230–31.

The Court affirmed the denial of the defendant's motion to suppress the search of the devices while reaffirming the border search doctrine:

> We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property. . . . [I]t does not make sense to say that electronic devices should receive special treatment because so many people now own them or because they can store vast quantities of records or effects.

*Id.* at 1233.

The *Touset* court rejected the argument that reasonable suspicion is needed to search a cell phone or laptop. *See id.* at 1234 (recognizing that the Fourth and Ninth Circuits had concluded that the Fourth Amendment requires reasonable

suspicion for forensic searches of electronic devices at the border, examining those courts' reasoning, and concluding "[w]e are unpersuaded").[3]

CBP Officers attempted to search Defendant's cell phone, which Defendant wiped of all contents by providing agents with a deletion code, thereby impeding their ability to carry out the search. (Doc. 34, Exh. 1. at 20:08:07 and Doc. 1 and Doc. 34 at 85.) This search, had agents been able to complete it, was squarely permissible pursuant to the border search doctrine and Eleventh Circuit precedent. No suspicion was required to search Defendant's cell phone. Therefore, under the law of this circuit, Defendant's motion to suppress the search and any evidence derived therefrom must be denied.

**B. The Primary Statement at Issue in and of Itself Constitutes the Crime Charged and is Not Subject to Suppression.**

As discussed above, binding Eleventh Circuit precedent authorized the search of Defendant's cell phone at the border. Similarly, binding Eleventh Circuit precedent holds that because Defendant's statement itself and the consequences that followed from it constitute the crime charged (Doc. 1), Defendant's

[3] The Second Circuit recently joined the Eleventh Circuit in holding that no reasonable suspicion is required for officers to search electronic devices at the border. *See Untied States v. Alisigwe*, —F.4th—, 2026 WL 2751713 (Sept. 17, 2026).

statement cannot be suppressed. *See United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976).[4]

Here, CBP officers presented Defendant with two options: (1) provide the passcode to his phone so that it could be immediately searched, or (2) decline to provide the password, and officers would seize the phone so it could be searched at a later time. (Doc. 34, Gov't Exh. 1 at 20:00:55 and Gov't Exh. 4.) Defendant chose neither option. Instead, Defendant decided to destroy the contents of his device by providing CBP officers with a deletion code that wiped his phone. (Doc. 34, Gov't Exh. 1 at 20:08:07 and Doc. 34 at 85.) The provision of this code (*i.e.*, the statement at issue), which triggered the deletion of Defendant's phone's contents upon entry, is precisely the crime with which Defendant is charged. (Doc. 1.) Because Defendant's statement itself and the consequences that followed from it constitute the crime charged, the provision of the deletion code and evidence of the subsequent deletion of Defendant's device's contents are not subject to suppression.

[4] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 681 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

In *Kirk* (a binding Fifth Circuit case), the Fifth Circuit held that "as a general rule it can be said that no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged." 528 F.2d at 1062. This is because "[t]he Fifth Amendment's prohibition against self-incrimination relates to crimes alleged to have been committed *prior* to the time when the testimony is sought." *See id.* at 1061 (emphasis added) (citing *Glickstein v. United States*, 222 U.S. 139, 142 (1911) and an earlier Fifth Circuit case). The Court in *Kirk* held that a defendant could not suppress statements he gave to Secret Service agents even if they were in violation of *Miranda* requirements because they constituted the basis of the charge against him — threatening to kill the President of the United States. *Id.* at 1060–62. Because the defendant's threat was itself a crime, the Court concluded his Fifth Amendment rights were not violated.

Relying on *Kirk*, the Eleventh Circuit has held that the exclusionary rule does not extend to statements made during a custodial interrogation that themselves constitute a new crime. *United States v. Owuor*, 397 F. App'x 572, 574–75 (11th Cir. 2010) (per curiam). In *Owuor*, a defendant was in a booking area of a jail when ICE agents overheard his strong accent. *Id.* at 573. The agents asked the defendant where he was from, and he replied that he was a United States citizen

and gave a social security number. *Id.* After the agents ran the defendant's information through a database, they learned he was born in Kenya and had provided a false social security number. *Id.* at 573–74. The ICE agents again interviewed the defendant, and he again said he was a United States citizen and made related statements. *Id.* After those statements were made, the agents gave the defendant *Miranda* warnings and stopped the interview. *Id.* at 574. The defendant was charged with falsely representing himself to be a United States citizen based on his statements to ICE during the interviews. *Id.* The defendant argued that the statements he made during his interview should be suppressed because he was not given *Miranda* warnings until after he made the statements. *Id.*

Concluding that *Kirk* controlled the outcome of the case, the Eleventh Circuit held that "statements to the ICE agents in the visitation room were *new crimes* rather than statements related to past crimes. Accordingly, there is 'no fifth amendment problem.'" *Owuor*, 397 F. App'x at 574–75 (emphasis added); *see also id.* (citing "*United States v. Paskett*, 950 F.2d 705, 708 (11th Cir. 1992) (explaining that 'no person has a constitutional right to be warned of his rights before he commits a crime' (quotation marks omitted)); *United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir. 1993) (concluding that defendant's threat to kill the president of the

United States was admissible even if a *Miranda* violation occurred because the threat was a new crime rather than evidence of a prior offense); *United States v. Mitchell*, 812 F.2d 1250, 1254 (9th Cir. 1987) (rejecting argument that the exclusionary rule bars prosecution of the crime itself), *overruled on other grounds by Planned Parenthood of Columbia/Willamette, Inc., v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1066–70 (9th Cir. 2002)").

Here, Defendant did not provide the real password to unlock his device so that the contents to his phone could be searched. He did not refuse to provide a password to unlock his device. Instead, he chose to commit a new crime by taking an action that would delete the contents of his phone and prevent their forensic recovery. Like in *Kirk* and in *Owuor*, Defendant's statement — *i.e.*, the provision of a deletion code that he knew would destroy the contents of his phone — to the CBP officers is "not confessional in nature, but in and of itself constitutes the crime charged." *Kirk*, 528 F.2d at 1062. Thus, neither Defendant's statement, nor any evidence derived therefrom, should be suppressed.

### C. Defendant was Not Entitled to a Lawyer or *Miranda* Warnings While Subject to Routine Questioning at the Border, Including Questioning During Secondary Inspection.

With regard to the remainder of Defendant's statements during his border interview, which do not in and of themselves constitute the crime charged here, a

violation of the Fifth Amendment did not occur, because Defendant was never in custody for purposes of *Miranda*, and was never entitled to a lawyer. Instead, Defendant was subject to routine questioning at the border. As such, the facts that he was not provided *Miranda* warnings, and that questioning continued after he asked to speak with his lawyer, cannot form the basis to suppress any statements he made to the CBP officers.

1. ***Defendant Had No Sixth Amendment Right to Counsel During the Border Inspection.***

At the outset, the Sixth Amendment right to counsel does not apply here. Although Defendant contends that his Sixth Amendment right to counsel was violated, (Doc. 41 at 22), the Sixth Amendment right to counsel is offense specific and "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary criminal judicial proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citations and quotation marks omitted). Further, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 176 (citations and quotation marks omitted). Because Defendant's statements occurred before his indictment and before his Sixth

Amendment right to counsel with respect to the instant criminal offense had been (or even could have been) invoked, that right also poses no bar to the admission of his statement in this case. *Id.*

### 2. *Defendant's Fifth Amendment Rights Were Not Violated Because Defendant Was Not Subjected to Custodial Interrogation.*

Turning next to the Fifth Amendment, *Miranda* is not implicated simply because an individual is the subject or target of an investigation, or because the person questioned is one whom the police suspect. *United States v. Manor*, 936 F.2d 1238, 1241 (11th Cir. 1991) (citation omitted). Whether Defendant was entitled to *Miranda* warnings and the availability of Defendant's Fifth Amendment right to counsel hinge on whether Defendant was subject to custodial interrogation. Here, Defendant was not subject to custodial interrogation, and thus there was no violation of his Fifth Amendment rights.

#### a. *Defendant Was Not in Custody.*

Whether someone is in custody turns on the objective determination—under the totality of the circumstances—of whether a reasonable person would feel a restraint on his freedom of movement to the "degree associated with a formal arrest" such that he would not feel free to leave. *Stansbury v. California*, 511 U.S. 318, 322–23 (1994); *see also Minnesota v. Murphy*, 465 U.S. 420, 430 (1984); *United*

*States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987). Defendant bears the burden of showing that he was in custody. *United States v. Woodson*, 30 F.4th 1295, 1302 (11th Cir. 2022).

The Eleventh Circuit has long held that an individual is not in custody for purposes of *Miranda* when being routinely questioned at the border. *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982) ("Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States."). Further, the Eleventh Circuit has cautioned that "events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country." *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) ("This idea is consistent with cases . . . , which have indicated that a secondary interview is part of the border routine and does not require Miranda warnings.") And restrictions on an individual's movement that are the result of a routine border inspection do not entitle an individual to *Miranda* warnings. *See United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011). Rather, at the border, only questioning that is "distinctly accusatory"

triggers *Miranda* warnings. *Id.* at 1109 ("[Q]uestioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest."); *id.* at 1111 (concluding that a border questioning became custodial when an agent accused the individual of training in an al-Qaeda camp and participating in terrorist activities); *see also United States v. Sanyaolu*, No. 116CR00126WSDJFK, 2016 WL 11467579, at *7–8 (N.D. Ga. Nov. 14, 2016), *report and recommendation adopted*, No. 1:16-CR-00126-WSD, 2016 WL 7111910 (N.D. Ga. Dec. 7, 2016) (discussing *Jayyousi* and observing that the three-hour interview in which the defendant was questioned in the presence of multiple armed federal agents who confronted the defendant "about not telling the truth about the source and purpose of the money that he had failed to declare . . . did not make [that portion of] the interview custodial," despite the questions involving allegedly criminal conduct and being accusatory in nature).

In assessing whether a defendant is in custody in the context of entry into the country based on the totality of the circumstances, the Eleventh Circuit has considered several factors: (1) whether the defendant was physically restrained by officers on the way to the scene of the interview; (2) whether handcuffs were used on the defendant; (3) whether officers had their guns drawn; (4) whether

the defendant was booked, told of formal accusations, or told he was under arrest; and (5) whether the defendant made admissions during the interview that would have led a reasonable person to conclude that he would be arrested immediately. *See Moya*, 74 F.3d at 1119; *United States v. Bentley*, No. 25-CR-20455, 2026 WL 2836452, at *18–19 (S.D. Fla. Sept. 9, 2026) (explaining the factors in deciding whether a defendant is in custody for purposes of *Miranda* at the border).

Applying the same factors to this case, each of the factors indicate that Defendant was not in custody for *Miranda* purposes at any time during his interview, and certainly not at the time he provided the deletion code to agents: (1) Defendant was not physically restrained by officers on the way to the secondary inspection area or during the interview; (2) no handcuffs were used on Defendant at any point; (3) officers never drew their weapons; (4) Defendant was not booked, told of formal accusations, or told he was under arrest; and (5) Defendant did not make any admissions during the interview that would have led a reasonable person to conclude that he would be arrested immediately. (Doc. 34, Exh. 1 and Doc. 34 at 16-17, 50, 54, 82.)

Further, the CBP officers' questions, and certainly the question about his passcode, in no way could be construed as sufficiently "accusatory" to transform

the confrontation into a custodial interrogation. (Doc. 34, Exh. 1 and Doc. 34 at 18-19, 25, 52, 81.) It makes no difference that Defendant has been the subject of a prior investigation. *See, e.g.*, *United States v. Villerius*, Case No. 1:17-cr-10648, 2018 WL 2325729, at *5 (S.D. Fla. May 1, 2018). Defendant was undergoing a routine secondary inspection with routine border inspection questions. Specifically, the CBP officers asked standard "5 Ws" admissions questions—that is (1) details of Defendant's recent travel, *e.g.*, when he traveled, where he went, why he went, who he stayed with, what he did there, in addition to general questions regarding (2) his travel history, and (3) his work history. (Doc. 34 at 18-19, 25, 52, 81.) Officer Findlay said that they were looking for people who are pedophiles and stuff like that, but specifically said he was not accusing Defendant of anything. (*Id.* at 82 and Doc. 34, Gov't Exh. 1 at 19:49:04.) At a later point in time, Officer Castro explained that the purpose of their inspection was to make sure that things like drug smuggling were not going on, but again specified "we're not accusing you, you know, or anything like that, but we're asking questions to do this inspection." (*Id.* at 19:57:39.)

As such, Defendant was not in custody or asked any accusatory questions, much less questioned to a "distinctly accusatory level" so as to trigger *Miranda* under Eleventh Circuit precedent.

***b. Defendant Was Not Entitled to Counsel During a Routine Border Inspection Because He Was Not in Custody.***

Similarly, as to the Fifth Amendment right to counsel, the protections of *Miranda*, *Edwards*, and their progeny only apply if a defendant is in custody. *See e.g.*, *United States v. Booker*, 561 F. Supp. 3d 924, 937 (S.D. Cal. 2021). In *Edwards*, the Supreme Court held that once an accused has invoked his Fifth Amendment right to have counsel present *during custodial interrogation*, he is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Moreover, an "applicant for admission in either primary or secondary inspection" does not possess "the right to representation, unless the applicant for admission has become the focus of a criminal investigation and has been taken into custody." 8 C.F.R. § 292.5(b). Because Defendant provided the statement at issue during a border inspection and while he was not in custody, as discussed above, his Fifth Amendment right to counsel had not attached, and his request for a lawyer did not mean that the CBP officers were required to cease their interrogation. As such his unanswered requests to speak with his lawyer pose no bar to the admission of any of Defendant's statements in his criminal case.

For these reasons, Defendant's Fifth and Sixth Amendment rights were not violated, and the motion to suppress his statements should be denied.

**D. Even if *Miranda* Warnings Were Required, Suppression of Evidence Derived from Defendant's Statements is Not Warranted.**

Defendant also seeks to suppress all fruits derived from his statements, including the provision of the statement at issue (*i.e.*, deletion code) and subsequent search of Defendant's phone. (Doc. 41 at 19.) But even if this Court were to find that *Miranda* warnings were required, the Supreme Court and Eleventh Circuit have recognized that the physical fruits of an unwarned, but uncoerced statement are not subject to suppression. *United States v. Patane*, 542 U.S. 630, 634 (2004) (Thomas, J., plurality opinion); *United States v. Morgan*, 143 F.4th 1264, 1284 (11th Cir. 2025).

In *Patane*, the plurality of the Supreme Court concluded that the Self-Incrimination Clause is not violated by the admission into evidence of the physical fruit of a voluntary statement. 542 U.S. at 634. The Eleventh Circuit has emphasized that no *Miranda* violation "that produces a voluntary statement is severe enough that the deterrence value of suppression outweighs 'the important probative value of reliable physical evidence.'" *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007) (quoting *Patane*, 542 U.S. at 645) (Kennedy, J.,

concurring)); *see also Morgan*, 143 F.4th at 1279 ("Because [the agent] didn't misinform Morgan about his *Miranda* rights, his answer was voluntary, and the fruits of his statement—here, the contents of his LG phone, which were derived from a search that followed the officers' determination that he had abandoned it—were fair game.")

Defendant's statements were voluntary. Whether a statement is voluntary is based on the totality of the circumstances. *See Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (citation omitted). "This totality of the circumstances test directs us ultimately to determine whether [the defendant's] statement was the product of 'an essentially free and unconstrained choice.'" *Id.* at 1152-53 (citation omitted). Among the non-exclusive factors courts consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *Id.* at 1153 (citations omitted).

CBP did not compel Defendant to make statements or provide his passcode; he provided the statements voluntarily. Defendant is an adult and an English-speaking U.S. citizen, who seemed to be of at least normal intelligence and understanding. (Doc. 34, Gov't Exh. 1.) The interview was not prolonged; it lasted only 41 minutes. *(Id.)* CBP did not threaten him, yell at him, restrain him,

use physical force against him, or do anything to overpower Defendant's free will. (*Id.* and Doc. 34 at 16-17, 50, 54, 82.) The officers did not make promises or provide inducements. Regarding the nature of the interrogation, during the routine border inspection, which consisted of questioning consistent with such, CBP explained to Defendant that a border inspection is administrative rather than criminal, which was why he was not entitled to counsel. (Doc. 34, Gov't Exh. 1 at 20:05:10.) CBP did not threaten Defendant with arrest or accuse him of a crime, CBP only told him they were looking for pedophiles and contraband. In fact, CBP repeatedly said they were not accusing Defendant of anything and that he could go once they got the information they needed to complete their inspection. (Doc. 34 at 82 and Doc. 34, Gov't Exh. 1 at 19:49:04, 20:05:10.)

Far from threatening Defendant with arrest or prolonged detention, Officer Castro provided the Defendant with a copy of the CBP tear sheet, which informed Defendant, among other things, of what to expect during the border search of his electronic devices and advised that in some cases, devices are temporarily detained or subject to seizure under the law. (*Id.* at 20:00:55, Exh. 4.) Officers also verbally explained the options Defendant had with respect to the search of his cell phone. One of those options was not to provide the passcode at all. (Doc. 34, Gov't Exh. 1 at 20:05:10.) At one point, Defendant told officers,

"I'm trying to decide if I'm going to give it to you." (*Id.* at 20:07:02 and Doc. 34 at 84.) Later, he was asked again by officers if he wanted to provide his password, and he responded, "sure," then provided the deletion code, "Killmenow. K-I-L-L-M-E-N-O-W." (*Id.* at 20:08:07.) That exchange does not reflect compulsion. Defendant giving this deletion code to CBP was his free and unconstrained choice.

A recent decision from the Southern District of Florida addressed whether the provision of a phone passcode during a border search was "compelled." *See United States v. Bentley*, No. 25-CR-20455, 2026 WL 2836452, at *18 (S.D. Fla. Sept. 9, 2026). In finding that the defendant's statement providing his password was not compelled, the district court explained:

> In sum, the tear sheet does not say that a traveler has no choice but to provide his passcode to CBP officers when requested. And the fact that the tear sheet advises travelers they must present electronic devices in a condition that allows for examination of the device and its contents (such as operable or unwiped) cannot be reasonably understood to convey that travelers have no choice but to state their passcode against their will, even considering the surrounding circumstances of a traveler's detention during the inspection process. *See United States v. Shvartsman*, 722 F. Supp. 3d 276, 322 (S.D.N.Y. 2024) ("[T]he Fifth Amendment is not violated whenever a person feels 'pressure' to speak; rather, to amount to compulsion, that pressure must overcome the 'resistance' of the suspect such that his 'will [is] overborne.'" (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000))). Nor can a statement of CBP's lawful border search authority to seize an electronic device that cannot be searched

> immediately upon a traveler's refusal to provide a passcode amount to undue coercion. *See United States v. Holmes*, 670 F.3d 586, 592–93 (4th Cir. 2012) ("[S]tatements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive."). The credible evidence in the record shows that Defendant provided his passcode to Officer Flores voluntarily, and neither law enforcement's conduct nor the statements in the CBP tear sheet, considering the totality of all circumstances, constituted compulsion within the meaning of the Fifth Amendment.

*Id.* at *18.

In sum, here, like in *Bentley*, Defendant voluntarily told the CBP officer his passcode instead of staying silent and having CBP detain his cell phone. Further, Defendant voluntarily decided to delete the contents of his cell phone, rather than providing his actual passcode in any event. Defendant was not in custody, but even if he was, because CBP did not compel Defendant's statements, and specifically the provision of his cell phone passcode, Defendant's statements and the provision of the deletion code do not offend the Fifth Amendment. Defendant's motion to suppress on this ground should be denied.

For all of the reasons stated above in Section D, Defendant's unwarned statements were voluntary, and Defendant's request to suppress the physical evidence, including his electronic device, should be denied.

**E. Even if the Court Found that Defendant's Statements Were Involuntary, the Contents of his Phone Should Still Not Be Suppressed Pursuant to the Inevitable Discovery Doctrine.**

Finally, even assuming for argument's sake that Defendant's statement related to the passcode was involuntary, the phone and its contents should not be suppressed under the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431, 447 (1984) (There is no rational basis to suppress evidence obtained by unconstitutional methods "if the government can prove that the evidence would have been obtained inevitably.").

Under the "inevitable discovery" or "ultimate discovery" exception, the Government may introduce evidence that it obtained through an illegal search if it shows: (1) "by a preponderance of the evidence that if there had been no constitutional violation, the evidence in question would have been discovered by lawful means," and (2) "that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *United States v. Watkins*, 13 F.4th 1202, 1210–11 (11th Cir. 2021) (en banc) (quotation marks omitted). To meet the preponderance-of-the-evidence standard, the Government need not show an "[a]bsolute certainty" that the evidence would have been discovered, just "that it is more likely than not the evidence would have been discovered without the violation." *Id.* at 1211. And

to meet the "active pursuit" prong, the Government only must show "that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." *Id.* (quotation marks and citation omitted).

A border search "may be conducted without any suspicion of criminal activity," *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988), and does not require a warrant. *Touset*, 890 F.3d at 1231.

Here, CBP officers conducted a lawful border inspection of Defendant's devices at the Atlanta International Airport. If Defendant had refused to provide the passcode, he would have been released and CBP would have detained his devices for forensic review. Then, the CBP officer would have provided the devices directly to FBI, and FBI computer forensics agents would have used forensic tools to try to access the contents of Defendant's electronic device without the passcode.

Thus, it is more likely than not that the contents of the device would have been discovered even without the alleged violation and by virtue of ordinary investigations of evidence. Accordingly, the cell phone and its contents should not be suppressed.

## Conclusion

Because the Eleventh Circuit has held that the border-search doctrine allows for the warrantless searches of electronic devices, because the primary statement at issue in and of itself constitutes the crime charged, and because Defendant was not subject to custodial interrogation, Defendant's motion to suppress should be denied.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

Matthew S. Carrico
MATTHEW S. CARRICO
*Assistant United States Attorney*
Georgia Bar No. 538608
Matthew.Carrico@usdoj.gov

Kassi N. Conley
KASSI N. CONLEY
*Assistant United States Attorney*
Georgia Bar No. 473972
Kassi.Conley@usdoj.gov

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Joseph Austin

Melissa McGrane

Federal Defender Program, Inc.

November 9, 2026

Kassi N. Conley

KASSI N. CONLEY
*Assistant United States Attorney*